[Civil No. 3809.   Filed May 22, 1937.]

[68 Pac. (2d) 679.]

JOHN W. MASURY & SON, a Corporation, Appellant, v. BISBEE LUMBER COMPANY, a Corporation, Appellee.

Messrs. Misbaugh & Fickett and Mr. James Elliott Dunseath, for Appellant.

Messrs. Sutter & Gentry, for Appellee.

LOCKWOOD, J.—This is an action by John W. Masury & Son, a corporation, hereinafter called plaintiff, against Bisbee Lumber Company, a corporation, hereinafter called defendant, to recover a balance on an open account amounting to $1,481.98. Judgment was rendered in favor of defendant, and plaintiff appealed.

The complaint, which was filed February 28, 1935, after setting up the capacity of the parties, alleged,

in substance, that the defendant had purchased merchandise consisting of paints and painting supplies, from a certain California corporation, in the amount of $10,652.80, and that defendant at different times, between November 21, 1928, and September 13, 1930, had paid on such account $9,170.82, leaving a balance due of $1,481.98. This account was duly assigned to plaintiff, and it was claimed that between the dates of December 9, 1931, and September 19, 1932, the defendant acknowledged such account as a present existing indebtedness, admitted liability thereon, and expressed a willingness to pay the same, in a writing duly signed by it. There was the usual prayer for judgment in the amount set forth.

The defendant, in answering, alleged that the cause of action set up by plaintiff arose out of mutual and current accounts between merchant and merchant; that the dealings between them ceased on the 13th of September, 1930, and that since said date defendant had made no acknowledgment in writing of the justness of the claim set forth in plaintiff's complaint as a present existing debt, nor admitted liability thereon, nor promised to pay it. This, of course, raised the issue of the statute of limitations. The case was submitted to the court on certain letters between plaintiff and defendant, the authenticity of which was acknowledged by both parties, and an admission by defendant that the balance on the account was as stated by the complaint and that it had not been paid. We quote these letters in full so far as they apply to the case, for plaintiff relies upon them to toll the statute, which had otherwise run as against the claim:

"March 17, 1931

"Bisbee Lumber Co., P. O. Box H, Lowell, Arizona.

"Gentlemen: Since closing our California branch we have never heard whether you desire to continue

with our line shipped from Chicago. If so, we would be glad to serve you with an arrangement by which you would not suffer through Freight rates.

"May we call to your attention at this time the balance on your account on which no remittance has been received in some time. We will appreciate a settlement. Kindly make check payable to this corporation.

"Very truly yours,
"EPP:EMN        JOHN W. MASURY & SON."
"December 5, 1931

"Bisbee Lumber Co., P. O. Box H, Lowell, Arizona.

"Gentlemen: We have not had a remittance from you to liquidate your indebtedness to John W. Masury & Son of California.

"Much to our regret we shall feel compelled to place the account with an agency unless we have an immediate substantial remittance and a satisfactory arrangement designed to discharge the entire balance.

"Very truly yours,
"EPP:EMN        JOHN W. MASURY & SON."
"Lowell, Arizona, Dec. 9, 1931.

"John W. Masury & Son, 42–50 Jay St., Brooklyn, New York.

"Gentlemen: Referring to your letter of December 5th, your company left us with a large stock of paint to dispose of and we are sitting down here like an orphan without a source of supply.

"We have never seen one of your salesmen since we left California and as you know to change Brands it will cost us money.

"We still have a large stock on hand and we feel we are entitled to some adjustment on this account. If you are willing to allow us a reasonable amount for this loss, we will settle the account promptly with you.

"Yours very truly,
"BISBEE LUMBER CO.
"E. MARKS, Manager."
"March 11, 1932.

"Bisbee Lumber Company, Lowell, Arizona.

"Gentlemen: We have given much thought to your communication of December 9th wherein you state that you are entitled to some consideration because of the closing of our branch house in California.

"We wish to be fair in every respect and therefore advise you that it will be satisfactory for you to deduct 20% from the open account and settle in full.

"Very truly yours,
"EPP :EMN              JOHN W. MASURY & SON."

"Lowell, Arizona, Sept. 19, 1932.
"John W. Masury & Son, Box 1012, City Hall Station, New York City, N. Y.

"Gentlemen: Attention Mr. E. P. Person

"We are not satisfied with the amount of discount offered us; you know in changing lines as you have forced on us by closing your San Francisco Branch we stand to lose considerable, and all the advertising on which we spent our own money is now a total loss.

"It will take us about six months more to get the paint reduced so that we may tell just what our loss will be on the stock, at which time we will be willing to settle with you, or we will give you a check for the amount on the basis of twenty-five cents on the dollar and call it 'square'; or we will pick up enough of your paint to settle the account and ship it to you at any designated place, you to pay the freight.

"Very truly yours,
"BISBEE LUMBER CO.
"E. MARKS, Manager."

There is but one ultimate question for our consideration, and that is whether the letters above set forth take the case out of the statute of limitations. The two letters written by defendant were dated, respectively December 9, 1931, and September 19, 1932. The present action was filed February 28, 1935, being on an open account between merchant and merchant. The statute applicable is subdivision 2, section 2061, Revised Code 1928, which reads as follows:

"*Four year limitation*. There shall be commenced and prosecuted within four years after the cause of action shall have accrued, and not afterward, the following actions: . . . 2. by one partner against his co-partner for a settlement of the partnership account, or upon mutual and current accounts concerning the trade of merchandise between merchant and merchant,

their factors or agents, and the cause of action shall be considered as having accrued on a cessation of the dealings in which they were interested together.''

The last dealings between the parties in regard to the account in question was September 13, 1930. The original account then was barred by the statute above set forth on September 13, 1934. Plaintiff does not dispute this, but contends that defendant by his letters of December 9, 1931, and September 19, 1932, tolled the statute by acknowledging the justness of the indebtedness, in writing, and promising to pay it. Defendant contends, on the other hand, that these letters do not amount to such an acknowledgment of the indebtedness as will take the case out of the statute, for several reasons, (a) that they do not sufficiently identify the indebtedness in question; (b) that they do not admit but rather deny the justness of the debt; and (c) that there is no unconditional promise to pay the debt, but, at the most, an offer of compromise and settlement. In passing upon the sufficiency of the letters in question to toll the statute, we think it advisable to discuss the statute of limitations somewhat at length as there are several legal principles bearing on the case which have never been definitely settled in this jurisdiction.

Since the development of statutes of limitations in America has followed very closely that of the English statutes, a brief survey of the origin and history of the rule in England will aid in better understanding of the principles applicable to our statutes. In the dawn of the English law, there was no definite time limit prescribed within which any particular action might be brought. It is true that there was a presumption of the payment of a debt after twenty years, but this was not conclusive, and only shifted the burden of proving nonpayment of the party seeking to enforce the claim. But the trouble caused by the attempted

enforcement of stale claims rendered this situation unsatisfactory, so that Parliament began to fix certain historical events as time limitations, and causes of action which arose previous to these events could not be enforced. Examples of such events are the reign of Henry I and the coronation of King Richard. The theory upon which these statutes was based was that it was beyond the power of man to remember back any further than the dates thus specified. This also, however, proved unsatisfactory, and in 1540 the statute of 32 Henry VIII was enacted, which, for the first time, assigned specific periods of time beyond which certain actions pertaining to realty could not be brought. It was not, however, until 1623 that such limitations were fixed for the bringing of personal actions. In that year the statute of 21 James I was passed. It prescribed a limitation of six years after the debt was due for the bringing of certain actions, including most of what are now called personal actions arising out of contract. *It did not, however, provide for any manner whatever in which rights of action of the nature governed thereby could be enforced after the statutory time had run. Murdock* v. *Waterman,* 145 N. Y. 55, 39 N. E. 829, 27 L. R. A. 418.

In the interpretation of such statutes by the courts, the question naturally arose as to whether they were based on the old common-law rule of presumption of payment above referred to, or whether they were to be construed as statutes of repose. At first the latter view prevailed, then the former, and finally the latter was again generally accepted as the true foundation. *Bell* v. *Morrison,* 26 U. S. (1 Pet.) 351, 360, 7 L. Ed. 174; *Shepherd* v. *Thompson,* 122 U. S. 231, 7 Sup. Ct. 1229, 30 L. Ed. 1156. As was said by Justice STORY in the case first cited:

"It has often been matter of regret, in modern times, that, in the construction of the statute of limi-

tations, the decisions had not proceeded upon principles better adapted to carry into effect the real objects of the statute; that, instead of being viewed in an unfavorable light, as an unjust and discreditable defence, it had received such support, as would have made it, what it was intended to be, emphatically, a statute of repose. It is a wise and beneficial law, not designed merely to raise a presumption of payment of a just debt, from lapse of time, but to afford security against stale demands, after the true state of the transaction may have been forgotten, or be incapable of explanation, by reason of the death or removal of witnesses. It has a manifest tendency to produce speedy settlements of accounts, and to suppress those prejudices which may rise up at a distance of time, and baffle every honest effort to counteract or overcome them. Parol evidence may be offered of confessions (a species of evidence which, it has been often observed, it is hard to disprove, and easy to fabricate), applicable to such remote times, as may leave no means to trace the nature, extent, or origin of the claim, and thus open the way to the most oppressive charges. If we proceed one step further, and admit that loose and general expressions, from which a probable or possible inference may be deduced of the acknowledgment of a debt, by a Court or jury; that, as the language of some cases has been, any acknowledgment, however slight, or any statement not amounting to a denial of the debt; that any admission of the existence of an unsettled account, without any specification of amount or balance, and however indeterminate and casual, are yet sufficient to take the case out of the statute of limitations, and to let in evidence, *aliunde,* to establish any debt, however large, and at whatever distance of time; it is easy to perceive, that the wholesome objects of the statute, must be, in a great measure, defective; and the statute virtually repealed.''

This last view is based upon the theory that, since the purpose of the law was to prevent stale demands and not merely to shift the burden of proof, the remedy for a creditor, which would otherwise be available, is totally extinguished after the expiration of the pre-

scribed statutory period, contrary to the common-law rule of presumption of payment, which merely meant that instead of payment being an affirmative defense of the defendant, it must be negatived by the proof of the plaintiff. It followed that the remedy originally existing, being totally extinct, could not be revived, and, therefore, for all practical purposes the original right was unenforceable.

As was said in *Le Roy* v. *Crowninshield,* 15 Fed. Cas., p. 362, No. 8,269:

"The leading argument against this doctrine, however, is, that statutes of limitation extinguish the remedy only, and not the right, upon contracts. Let us not deceive ourselves; there is no magic in words. Is the proposition, thus laid down, true to the extent, which the purpose, for which it is introduced, requires? The distinction between a right and a remedy is admitted. But can a right be truly said to exist upon a contract, when all remedy upon it is legally extinguished? . . . A statute, therefore, that takes away all remedy upon a contract, cannot be truly said not to affect the right, or obligatory force, of such contract. . . .

"The distinction, which is here alluded to, between the absolute extinction of a debt, and the positive presumption of its extinction, which the law allows to the debtor, and which becomes absolute, when the prescription is pleaded by him, is just in itself. It proceeds upon the ground, not of a strict legal right in the creditor, which he may enforce against the will of the debtor, but upon the notion, that there still exists, notwithstanding the statutable prescription, a moral obligation, binding *in foro conscientiae,* which, if recognized by the debtor, or discharged by him, repels any imputation, that the transaction is a nude pact without consideration. Payment, therefore, by the debtor, once made, cannot be recalled, for it is an equitable and honest act, and founded in moral obligation. But still there is not, strictly speaking, any right in the creditor to claim payment, for the law has made the bar, if pleaded, an estoppel of the right. Such right

is technically extinguished in contemplation of law by the presumption of extinction, until the debtor himself negatives the presumption, by some act or admission. . . .

"It is plain, therefore, that when the remedy is said to be extinguished by a prescription, and not the right, we are not to understand the term 'right,' in its technical legal sense, but merely as a moral obligation and claim in natural justice. . . . And I am not aware, that in any exact legal sense a right can be said to subsist upon a contract, where the law has taken away all the power of enforcing its obligation by any remedy."

The English judges, however, whether it be because of their essential conservatism and dislike of the introduction of a new feature into the law, or because of the apparent injustice of permitting a debtor to refuse to pay an honest debt about whose existence there might be no dispute, merely because his creditor had been lenient in enforcing the payment, adopted a principle of construction which, in many cases, permitted the recovery of the debt, notwithstanding the fact the statute had run. The reasoning by which they reached this conclusion may be stated as follows:

"It is true the statute has destroyed the remedy as to the original contract creating the debt, but if a debtor acknowledges the original debt and promises to pay it, a new contract has arisen, based, it is true, on the original one but legally distinct therefrom, and the statute begins to run anew on this new contract from the time such promise was made."

That this must have been the reasoning is shown by the fact that the *acknowledgment* of the debt, without a new promise express or implied, was insufficient to sustain an action. *Dickson* v. *Thompson,* 2 Show. 126, 2 Vent. 152, 89 Eng. Reprint, 835; *Hoylin* v. *Hastings,* 1 Comyn. 54, 88 Eng. Reprint, 1277. It is obvious that in order to support this theory, the new contract, like any other, requires a consideration, that it might

be enforceable. This consideration was quickly found in the *moral* obligation to pay the original debt which still existed, notwithstanding that the *legal* obligation had been wiped out by the statute. *Le Roy* v. *Crowninshield, supra*. The next step was to hold that the new promise to pay could be not only express but implied, and one of the facts raising this implication was held to be a partial payment on the debt. *In re Hollingshead,* 37 L. R. Ch. Div. 651. A natural corollary of the rule was that the new acknowledgment and promise could be either oral or written, for contracts, aside from some few special ones which were required to be under seal or were affected by the statute of frauds, were just as valid when made orally as when made in writing. It appeared, however, after some experience, that this rule permitted many false and fraudulent actions, for the assertion of an oral acknowledgment of a debt and a promise to pay was easy to make and difficult to disprove. It was not, however until the adoption of Lord Tenterden's Act in 1828 that proof of the acknowledgment and new promise was required to be made in writing. Since that time then the essential principles of English law of limitations have not changed materially, although the details have varied. These principles may be stated as follows: (a) The statute itself is a statute of repose and, at the end of the period fixed thereby, the remedy available to the creditor on the original debt is dead and cannot be reviewed; (b) cases frequently arise when, after the statute has begun to run, creditors acknowledge the justness of the original debt, and promise to pay the same, or even make payments thereon. Under the statute, however, none of these things revive the original remedy, and the debtor, notwithstanding the acknowledgment, promise to pay, and even part payment, can at any time thereafter refuse to pay the original debt, and no action can be

brought against him on it. The courts then, and not the legislatures, introduced the theory that an acknowledgment of and *promise to pay* the original debt created a *new contractual obligation,* supported by the consideration of the moral obligation of the old debt, and permitted an action on the new contract. As was said by Best, C. J., in *A'Court* v. *Cross,* 3 Bing. 329, 130 Eng. Reprint, 540:

" . . . It seems to me the Plaintiff should have been required to declare specially on this new promise, and ought not to have been permitted to revive his original cause of action, for which the statute expressly declares no action shall be brought. By the present practice, the defendant has not such distinct information, as, I think, he is entitled to, that the plaintiff means to avail himself of some promise to recover a stale demand. The real cause of action is kept entirely out of view, and one that cannot be supported brought forward. This is inconsistent with what is said to be the intent of special pleading.

"The Courts, however, have not stopped here; they have said acknowledgment of a debt is sufficient, without any promise to pay it, to take a case out of the statute. I cannot reconcile this doctrine, either with the words of the statute, or the language of the pleadings. The replication to the plea of *non-assumpsit infra sex annos* is, that the Defendant did undertake and promise within six years. The mere acknowledgment of a debt is not a promise to pay it: a man may acknowledge a debt which he knows he is incapable of paying, and it is contrary to all sound reasoning to presume from such acknowledgment that he promises to pay it; yet without regarding the circumstances under which an acknowledgment was made, the Courts, on proof of it, have presumed a promise.

"It has been supposed that the legislature only meant to protect persons who had paid their debts, but from length of time had lost or destroyed the proof of payment. From the title of the act to the last section, every word of it shows that it was not passed on this narrow ground. It is, as I have heard it often called by great judges, an act of peace. Long dor-

mant claims have often more of cruelty than of justice in them. Christianity forbids us to attempt enforcing the payment of a debt which time and misfortune have rendered the debtor unable to discharge. The legislature thought that if a demand was not attempted to be enforced for six years, some good excuse for the non-payment might be presumed, and took away the legal power of recovering it. I think, if I were now sitting in the Exchequer Chamber, I should say, that an acknowledgment of a debt, however distinct and unqualified, would not take from the party who makes it the protection of the statute of limitations. But I should not, after the cases that have been decided, be disposed to go so far in this Court, without consulting the judges of the other Courts. There are many cases from which it may be collected, that if there be anything said at the time of the acknowledgment to repel the inference of a promise, the acknowledgment will not take a case out of the statute of limitations.

"In the present case the Defendant, at the time he acknowledged the debt, said he would not pay it, because the plaintiff had arrested him.

"I cannot, therefore, say that there was any cause of action within six years before the bringing of the action, and the rule for setting aside the nonsuit must be discharged."

Early in the history of the settlement of America, the legislative bodies of the various English-speaking colonies began adopting statutes of limitations, and while the language has varied from time to time most of the real substance of 21 James I is still preserved therein, and it is apparent that, with the exception of a few states which we shall refer to in the later portion of this opinion, the essential principles of the American statutes of limitations are based upon the statute of 21 James I and the decisions of the English courts interpreting it, with the addition generally of a statutory application of Lord Tenterden's Act.

When the territorial area, which is now the state of Arizona, first became organized, after its cession by the Republic of Mexico to the United States, it was a part of New Mexico. The organic act of that territory was approved September 9, 1850 (9 Stat. 446), and provided, among other things, that the Constitution and all laws of the United States, which were not locally inapplicable, should have the same force and effect in New Mexico as elsewhere within the United States. The Territory of Arizona, as a separate entity, was organized by virtue of the Act of Congress, as approved February 24, 1863 (12 Stat. 664), and by such organic act all legislative enactments of the Territory of New Mexico, not inconsistent with the organic act itself, were extended to and continued in force in the new Territory of Arizona until repealed or amended by future legislation. One of the first businesses of the legislative authorities of the new territory was to adopt a code of laws, commonly referred to as the Howell Code of 1864. In this Code we find chapter XXXV, dealing with the limitation of actions, and we note that it is very like in principle to the statute of 21 James I, *supra,* and that, like that statute, there is no provision for a revival of a remedy once barred by the statute. The only portion of that Code which even suggests that, after the statute has run, the creditor has any rights arising out of the original obligation, is contained in section 28 of the chapter, which reads as follows:

"No acknowledgment or promise shall be sufficient evidence of a new or continuing contract, whereby to take the case out of the operation of this statute, unless the same be contained in some writing signed by the party to be charged thereby."

This chapter was carried forward in the compiled laws of 1877, in substantially the same language as that of the Howell Code, including section 28, *supra,*

and again omitting any specific provision authorizing the revival of the original remedy provided by the statute. Upon an examination of the statutes of the other states, it is very evident that section 28, *supra,* was taken from the statute of limitations adopted by the first legislature of the state of California as chapter 127, passed April 22, 1850, and the California decisions interpreting such section would necessarily be very persuasive if it were still part of our statutes. In 1887, however, an entirely different situation arose. Our statutes were not merely compiled, but were revised, and adopted by the fourteenth legislature of the Territory of Arizona as revised. Title 44 of the 1887 Code (paragraph 2297 et seq.) deals with the subject of limitations, and chapter 2 of the title covers limitation of personal action. It differs considerably from the provisions of chapter 35 of the Howell Code, both in form and substance, but again we find no express provision that anything should revive a remedy already barred by statute. Paragraph 2327, however, of that Code reads as follows:

"When an action may appear to be barred by a law of limitation, no acknowledgment of the justness of the claim made subsequent to the time it became due shall be admitted in evidence to take the case out of the operation of the law unless such acknowledgment be in writing and signed by the party to be charged thereby."

A comparison with section 28, *supra,* shows very material differences. In the one case "acknowledgment" and "promise" are referred to in the alternative. In the other only "acknowledgment" is mentioned. In section 28 "acknowledgment" or "promise" is apparently to be evidence of either a "new" or a "continuing" contract in the alternative, while in paragraph 2327, *supra,* nothing is mentioned in regard to the nature of the contract which the acknowl-

edgment refers to. An examination of the Code of 1887 shows clearly that our statute of limitations therein was taken from that of the state of Texas, and particularly that paragraph 2327 comes from that state. *Work* v. *United Globe Mines,* 12 Ariz. 339, 100 Pac. 813. The provisions of that Code have been carried forward in the Code of 1928 substantially as they then existed, and section 2068 of the later Code is almost *verbatim* 2327 of the Code of 1887. It would appear, therefore, that the decisions of the Supreme Court of Texas, particularly those made before 1887, are of great value in the interpretation of the meaning of this section.

With this *résumê* of the history of our statute of limitations, let us now consider its interpretation viewed, as we must view it, in the light of its history. As we have said, nowhere in our statute nor in any of its predecessors, so far as we have been able to ascertain, is there any express provision requiring or permitting the revival in any manner of a remedy for an obligation already barred by the statute, nor for extending the time after which the statute should begin to run, nor is there any explicit authorization of a new obligation or remedy based on the original one. Such a right and such a remedy, if either exists, is necessarily, therefore, based upon the principles of the common law. Section 2068, *supra,* like Lord Tenterden's Act, is merely a rule of evidence, applied to a right which it is assumed by the statute exists as a matter of common law. *Cotulla* v. *Urbahn,* 104 Tex. 208, 126 S. W. 1108, 135 S. W. 1159, 34 L. R. A. (N. S.) 345, Ann. Cas. 1914B 217. Let us, therefore, look to the common law to determine the nature and extent of the right which it gives, so far as Arizona is concerned. Our legislature first adopted the common law in the Howell Code in the following language:

"The common law of England, so far as it is not re-pugnant to, or inconsistent with, the constitution and laws of the United States, or the bill of rights or laws of this Territory, is hereby adopted, and shall be the rule of decision in all the courts of this Territory."

It was soon discovered that in many features the old common law was inapplicable to our conditions, and in 1887 the language above set forth was modified by paragraph 2935, Code of 1887, to read as follows:

"The common law of England so far only as it is consistent with and adapted to the natural and physical condition of this territory, and the necessities of the people thereof, and not repugnant to, or incon-sistent with the constitution of the United States, or bill of rights, or laws of this territory, or established customs of the people of this territory, is hereby adopted and shall be the rule of decision in all the courts of this territory."

And it is substantially in this form that it has been carried forward through the Codes of 1901 (paragraph 2533) and 1913 (paragraph 5555) into that of 1928 (section 3043). We think that the principles of limi-tations of actions obtaining under the common law of England are, in all probability, as well adapted as to the natural and physical conditions of this state and the necessities and established customs of the people thereof as to those of the mother country, differing in that respect from matters like community property, water rights, and other similar subjects of substan-tive law. The rules laid down by the common law of England, therefore, on the subject of limitations are the law of Arizona, except as they be modified or changed by our statute. The question arises, though, as to what principles of English law are, within the meaning of our statute, "common law" and what are not. The large majority of our states have statutes which, in substance, recognize the English common law as part of the law of America, but the meaning of these

words "common law" is by no means uniform in the various states. The reason for this lack of uniformity is that the legislatures of many of the states have fixed the date at which the common law of England became crystallized, so far as its application to the particular state is concerned, at a time named in the statute of adoption. In most of the original thirteen states, where the legislatures have not specifically fixed the date at which the common law of England is presumed to have crystallized, the courts have generally held it to be the *lex non scripta* and the general statutes of Great Britain in amendment thereof which were in force at the time of the first immigration of our English ancestors to the continent. *Doe ex dem. Patterson* v. *Winn,* 5 Pet. 233, 8 L. Ed. 108; *Wheaton* v. *Peters,* 8 Pet. 591, 8 L. Ed. 1055. On the other hand, many of the states take a different view. The matter is ably discussed in the case of *Browning* v. *Browning's Estate,* 3 N. M. 371, 9 Pac. 677, 683, wherein the court says:

"From the authorities cited it is clear that there are three classes of 'common law as recognized in the United States of America': First, in those states which were a part of the original colonies, and which have not by legislation adopted statutes passed prior to a particular date, the unwritten law, and such general British statutes, applicable to their condition, as were in force at the time of the formation of the colonial governments, and such as were afterwards adopted, expressly or tacitly, constituted the common law; second, in those states which have adopted the common law, and the British statutes passed and in force prior to the date fixed in the act of adoption, and were of a general nature, and suitable to their situation, such common law and statutes constitute their common law; and, third, in those states and territories which were not of the original colonies, and which have not in terms adopted any English statutes, but have adopted the common law, the unwritten or com-

mon law of England, and the acts of parliament of a general nature, not local to Great Britain, which had been passed and were in force at the date of the war of the Revolution, and not in conflict with the constitution or laws of the United States, nor of the state or territory, and which were suitable to the wants and condition of the people, are the common law of such states and territories.

"This territory belongs to the last class. It was not a part of the original colonies, but was acquired in 1848. The legislature has not in terms adopted any British statutes, nor has it undertaken to define what is embraced in the words 'common law' used in section 1823, *supra*. We are therefore of opinion that the legislature intended, by the language used in that section, to adopt the common law, or *lex non scripta*, and such British statutes of a general nature, not local to that kingdom, nor in conflict with the constitution or laws of the United States, nor of this territory, which are applicable to our condition and circumstances, and which were in force at the time of our separation from the mother country."

We agree that the rule laid down by the Supreme Court of New Mexico is the one applicable to Arizona, and hold that the "common law" referred to by our legislature at various times means the unwritten or common law of England, together with the acts of parliament of a general nature, and not local to Great Britain, which had been passed and were enforced at the time of our separation from the mother country so far, of course, as they are suitable to our wants, conditions, and circumstances

It is plain from this definition that the statute of limitations of 21 James I falls within this category, and necessarily the decisions of the English courts up to our separation from the mother country and the common-law principles declared by them are equally so. It, therefore, follows that the views of those courts in regard to the original statute of limitations, the principles upon which they are based and the situations

to which it would and would not have been applied are part of our common law also. That this has been recognized since Arizona has had an organized government is shown conclusively by the fact that, although nowhere in our statute is there found any direct provision that under any circumstances a creditor has any remedy whatever upon a debt where the original remedy is barred by the terms of the statute, our courts and legislatures have obviously accepted as a matter of course that the bar does not apply when there has been a new promise to pay made after the bar of the statute had run, and have adopted the reasoning of the English courts that this is because as soon as there is a new contract based upon the consideration of the moral obligation of the old contract, the statute does not begin to run as to it until the time when the obligation under the *new contract* becomes due. *Moore* v. *Diamond D. G. Co.,* 47 Ariz. 128, 54 Pac. (2d) 553; *Button* v. *Wakelin,* 41 Ariz. 84, 15 Pac. (2d) 956.

It is apparent, therefore, from a review of the history of the statute and the foregoing authorities, that after the statute of limitations has run, it is absolutely necessary, in order to give the creditor the right to recover what was at one time justly due him, to have a new promise to pay that particular debt. As was said in *Jones* v. *Moore,* 5 Bin. (Pa.) 573, 6 Am. Dec. 428:

"The letters of the defendant are said to contain an acknowledgment of the debt, which, as the plaintiffs' counsel contends, is sufficient *per se,* to take the case out of the statute, not because it is evidence of a new promise, but because it revives the debt. There is some confusion, and perhaps some inconsistency in the cases on this subject; but it appears to me from the reason of the thing, and from a review of all the cases, that an acknowledgment of the debt can only be considered as evidence of a new promise, or what is pretty

much the same thing in substance, as a circumstance from which the law will imply a new promise.''

A mere acknowledgment of the justness of the debt is not sufficient, without a promise to pay it either express or implied, unless the statute so provides. The situation was elaborately discussed in the case of *Coles* v. *Kelsey,* 2 Tex. 541, 47 Am. Dec. 661, under a statute similar to our section 2068, Revised Code of 1928, and from which that section was evidently taken, and the court said:

''It will, however, be well to lay down some rules, as to what will be a sufficient subsequent promise or acknowledgment to take the case out of the bar of the Statute. By an express provision in our Statute, 'That when any action may appear to be barred by any law of Limitation, no acknowledgment of the justice of the claim, made subsequent to the time it became due, shall be admitted in evidence to take the case out of the operation of the law, unless such acknowledgment be in writing, and signed by the party to be charged thereby.' This Statutory provision was designed to put an end to the almost infinite variety of decisions, as to what amounted to a subsequent promise. But the better opinion seems to be, that the only difference introduced by the provision, is, as to the character of the proof of the acknowledgment, and not as to what words would constitute such acknowledgment. In Story on Contracts, S. 1013, the following doctrine will be found: 'The operation of the Statute may also be frustrated, by an acknowledgment of the existence of the debt, or by a new promise to pay it. This promise, or acknowledgment, is considered as a new promise, founded upon the previous debt as a consideration, and must be sufficient in itself to support an action for the debt, independent of the original promise. The acknowledgment is to be considered not as a revival of the original agreement, but as a new and distinct agreement in itself.' And the same author proceeds in the next section to illustrate the text. 'If there be no express promise to pay, a promise may be raised by implication of law, from the acknowledg-

ment of the party. But such an acknowledgment must contain an unqualified admission of the debt, and a willingness to pay it. An acknowledgment of the original justice of the claim is not sufficient to take the case out of the Statute, unless accompanied with an admission of the party's present liability. If the acknowledgment be conditional, the remedy only revives on the performance of the condition. It is not necessary, however, that any specific sum should be acknowledged to be due, if the acknowledgment be sufficiently broad to include the debt, and sufficiently particular to show that it was the subject matter of the contract.'

"The Supreme Court of the United States in the case of *Moore* v. *Bank of Columbia,* 6 Pet. 86 [8 L. Ed. 329], maintained and laid down the rules to be the same as cited from Story. The Statute of 9th George 4, ch. 14, contains a provision that in its terms, so far as it relates to a subsequent promise, is not materially different from our own, and the decisions of the English courts under that Act, appear to harmonize with the doctrine laid down by Story, and by the Supreme Court of the United States. From which it appears that there must be an acknowledgment of the debt existing and an expression of a willingness to pay it; both must concur; an acknowledgment of the debt is not sufficient; but there must be an expression of a willingness to pay."

In the case of *Steinfeld* v. *Marteny,* 40 Ariz. 116, 10 Pac. (2d) 367, we have referred to *Coles* v. *Kelsey, supra,* specifically, and stated that an acknowledgment, without a promise to pay, is insufficient; both must concur. And this is still the holding of the many Texas cases which plaintiff contends has modified or changed the rule of *Coles* v. *Kelsey, supra.* We have examined all these cases carefully, and think that they adhere strictly to the fundamental principle of that case, to wit, there must be both (a) an acknowledgment of the debt, and (b) a willingness to pay it. All these cases do beyond that is to discuss just what is sufficient to show these two necessary elements.

Nowhere is there one which suggests that an admission of the justness of the original debt, when it is coupled with or limited by an offer to pay only something less or different from what is claimed by the creditor or a refusal to pay at all, is sufficient to toll the statute. It is true the promise to pay need not be *directly* expressed, but may be implied from the circumstances, and the courts of Texas, in common with those of most of the other states, have gone to great lengths in holding that such implication exists. The furthest, however, that even the most liberal court, in the absence of some special statute, has been willing to extend this doctrine of an implied promise to pay, is that when the acknowledgment of the justness of the debt is positive and *nothing is said indicating an unwillingness to pay it,* the law implies the promise. But the overwhelming weight of modern authority is that when coupled with an admission of the debt there is an express denial of a willingness to pay, the acknowledgment alone may not be accepted and the denial rejected, and a new promise implied therefrom. *Jenkins* v. *Boyle,* 13 Fed. Cas., p. 454, No. 7,262; *Vogelsang* v. *Taylor,* (Tex. Civ. App.) 80 S. W. 637; *Bailey* v. *Crane,* 21 Pick. (Mass.) 323; *Laurence* v. *Hopkins,* 13 Johns. (N. Y.) 288. It is also the general rule, though there may be a few exceptions thereto, that if the promise to pay is conditional, the creditor must show that the condition has been complied with before he can maintain his action. *Bell* v. *Morrison, supra;* 37 C. J. 1119, and cases cited. This is but logical, for if the action is based upon a new promise to pay, as practically all the authorities hold that it is, regardless of its form, it would be absurd to take an express promise to do one thing as meaning a promise to do another. Therefore, an acknowledgment of an original indebtedness accompanied by a claim of a set-off and an expression of willingness to pay only in

case the set-off is allowed, is not considered as sufficient to sustain an action for the amount originally due. The creditor may recover only for the amount due after the set-off is allowed as claimed. *Sutton* v. *Burruss,* 9 Leigh (36 Va.), 381, 33 Am. Dec. 246; *Stiles* v. *Laurel Fork Oil etc. Co.,* 47 W. Va. 838, 35 S. E. 986; *Bradley* v. *Field,* 3 Wend. (N. Y.) 272; *Nicholls* v. *Warfield,* 18 Fed. Cas., p. 182, No. 10,234; *Teessen* v. *Camblin,* 1 Ill. App. 424; *In re River Steamer Co.,* L. R., 6 Ch. 822. Nor is an offer of a compromise sufficient to take a case out of the statute of limitations. *Bell* v. *Morrison, supra; Thomas* v. *Carey,* 26 Colo. 485, 58 Pac. 1093; *Goldstein* v. *Gans,* (Tex. Civ. App.) 32 S. W. 185; *Heaton* v. *Leonard,* 69 Hun, 423, 23 N. Y. Supp. 469. And an offer to pay in property, other than money, is merely a conditional promise and must be accepted as made or it does not give rise to an action against the debtor. *Kampshall* v. *Goodman,* 14 Fed. Cas., p. 106, No. 7,605; *Bates' Admr.* v. *Bates,* 33 Ala. 102; *Bush* v. *Barnard,* 8 Johns. (N. Y.) 407; *Mitchell* v. *Clay,* 8 Tex. 443; *Cawley* v. *Furnell,* 138 Eng. Reprint, 915. In the case first cited, the court said:

"Now it would seem, that a distinct and an unequivocal acknowledgment of the indebtment, after the statute had run, should remove the bar and give legal force to the demand. But the current of decisions in our courts is that the acknowledgment does not revive the original cause of action, but is the foundation of a promise on which an action may be sustained. In the case of *Bell* v. *Morrison,* 1 Pet. (26 U. S.) [351] 355 [7 L. Ed. 174], this subject was considered at great length, and the court say: 'There is some confusion in the language of the books, resulting from a want of strict attention to the distinctions here indicated. It is often said that an acknowledgment revives the promise, when it is meant, that it revives the debt or cause of action. The revival of a debt supposes that it has been once extinct and gone; that there has been a period in which it had lost its legal use and

vitality. The act which revives it, is what essentially constitutes its new being, and is inseparable from it. It stands not by its original force, but by the new promise, which imparts validity to it. Proof of the latter is indispensable to raise the *assumpsit* on which the action can be maintained. It was this view of the matter which first created the doubt, whether it was not necessary that a new consideration should be proved to support the promise, since the old consideration was gone. The doubt has been overcome; and it is now held, that the original consideration is sufficient, if recognized, to uphold the new promise, although the statute cuts it off, as a support for the old. What indeed would seem to be decisive on this subject, is, *that if the new promise is qualified or conditional, it restrains the rights of the party to its own terms; and if he cannot recover by those terms, he cannot recover at all.'* Here is a principle laid down, and it is this: The action must be brought and sustained on the new promise, with no other reference to the old promise, which is barred, than as the consideration of the new one. If the acknowledgment of the indebtment be clear and unequivocal, and without condition, the law implies a promise to pay; *but if the terms of payment are connected with the acknowledgment of the debt, the new remedy is on the terms proposed.* Almost numberless citations of decisions might be made, on this question, but they would rather confuse than make clearer the above statement. It embodies the principle upon which the modern decisions under the statute rest.

"It only remains to apply the above principle to the case before us." (Italics ours.)

It appears that the majority of the cases that deal with the subject follow a consistent and logical theory from beginning to end. Starting with the undoubted fact that the statute of 21 James I contains no provision for a remedy for a creditor after the statute has run against the original debt, and the principle that the statute is one of repose and not of presumption of payment, these courts have recognized and

insisted that the only way in which the creditor may recover is by a new promise or contract, and that the only part which the old contract plays therein is the consideration for the new one.

It is true that there are a few cases which have apparently departed from the general rule, but they may be divided, we think, into three classes, (a) those states like Kansas, Iowa, and New Mexico, where the statute itself has been modified to provide for the revival of the original debt; (b) states which have returned to the principle that the statute is not one of repose but of presumption of payment; and (c) some cases where the injustice of allowing the debtor to escape payment in the concrete case has caused the court to fall into the error illustrated in the old adage that "hard cases make bad law."

The plaintiff, however, while tacitly admitting that an acknowledgment made after the bar of the statute has become complete must carry with it a promise to pay, contends there is a difference when it is made after the statute has begun to run, but before the bar is established, and that in such cases the action is upon the old debt and, therefore, a mere acknowledgment of the justness of the original indebtedness is sufficient to start the statute running anew without a promise to pay. In support of this, he cites many cases as sustaining his contention. We have examined these cases, and are of the opinion they fall into three classes. *Senninger* v. *Rowley,* 138 Iowa 617, 116 N. W. 695, 18 L. R. A. (N. S.) 223; *Elder* v. *Dyer,* 26 Kan. 604, 40 Am. Rep. 320; *Romero* v. *Hopewell,* 28 N. M. 259, 210 Pac. 231, come from jurisdictions where the statute expressly states that an acknowledgment of the debt alone is sufficient, and that a new promise is not required. For example, in New Mexico the statute provides that "causes of action founded upon contract shall be revived by an admis-

sion that the debt is unpaid, as well as by a new promise to pay the same'' (Comp. St. 1929, § 83–111), and the Iowa statute is similar in its character. Of course, if the local statute expressly provides that the original causes of action shall be revived by *either* an acknowledgment or a promise to pay, there can be no question that the acknowledgment alone is sufficient to sustain the action.

The second class contains such cases as *Griffin* v. *Lear,* 123 Wash. 191, 212 Pac. 271; *Berryman* v. *Becker,* 173 Mo. App. 346, 158 S. W. 899; *Outwaters* v. *Brownlee,* 22 Cal. App. 535, 135 Pac. 300; *Breese* v. *O'Brien,* 102 Mont. 547, 59 Pac. (2d) 65. These states have statutes similar in language to section 28 of the Howell Code above referred to, which provides for ''new'' and ''continuing'' contracts. The original statute was apparently taken from California and that court held, in the case of *McCormick* v. *Brown,* 36 Cal. 180, 95 Am. Dec. 170, as follows:

''It is provided by section thirty-one of the Statute of Limitations, that 'no acknowledgment or promise shall be sufficient evidence of a new or continuing contract, whereby to take the case out of the operation of this statute, unless the same be contained in some writing, signed by the party to be charged thereby.'

''There are two ultimate facts that may be proved in the mode prescribed—a continuing contract, and a new contract. The acknowledgment or promise made while the contract is a subsisting liability establishes a continuing contract; and when made after the bar of the statute, a new contract is created.''

Following this distinction, it was held that by the terms of the statute, since the acknowledgment or promise made before the bar was complete continued the original obligation, the suit must be brought on it. But even in such case, unless a new promise to pay appeared, express or implied, the statute was

not tolled. In *Rodgers* v. *Byers,* 127 Cal. 528, 60 Pac. 42, 43, the court said:

"If the acknowledgment or the promise be made while the original obligation is legally enforceable, and, if no conditions be attached to the promise, then the action, though brought after the statute of limitations would have ordinarily barred the remedy against the original obligation, is still upon the original obligation, which becomes 'a continuing contract' under section 360 of the Code of Civil Procedure, because the bar of the statute has been lifted and removed. *McCormick* v. *Brown,* 36 Cal. 180 [95 Am. Dec. 170]; *Chaffee* v. *Browne,* 109 Cal. 211, 41 Pac. 1028; *Southern Pacific Co.* v. *Prosser,* 122 Cal. 413 [52 Pac. 836], 55 Pac. 145.

"But, upon the other hand, in the case of a new promise, made while the original obligation is legally enforceable, if that promise be not a general promise to pay the obligation according to its tenor and terms, but is a promise coupled with any condition, and an action is brought after the statute of limitations would have barred the remedy upon the original obligation, the action of plaintiff is then upon the substituted, conditional promise, and not upon the original obligation. Such substituted, conditional promise must be pleaded, the breach of it averred, and the recovery had after such showing. *Curtis* v. *City of Sacramento,* 70 Cal. 412, 11 Pac. 748."

The only difference, according to the California decisions, between the two classes of cases is that in one case the pleading is supposed to rest upon the original contract *as continued,* and in the other upon a *new contract.* But in both the real reliance is on the *new promise to pay,* express or implied. The Supreme Court of Idaho, a state which has a statute similar to that of California, says in *Dern* v. *Olsen,* 18 Idaho 358, 110 Pac. 164, 166 L. R. A. 1915B 1016, Ann. Cas. 1912A 1, discussing the cases which say that the acknowledgment alone is sufficient and those which hold

there must be both an acknowledgment and promise to pay, says:

"Now, it seems to us that the authorities may be reconciled on the subject of a promise to pay when it is remembered that the acknowledgment of an existing indebtedness, *in the absence of a specific refusal to ever pay the debt,* necessarily carries with it the implied promise to pay it at some time in the future. This, it seems to us, is just as true in a case of this kind as it is where A. purchases goods from B. without saying anything about ever paying for the goods. The presumption is that A. is an honest man, and that when he secures the goods he means to pay for them, and the law raises an implied promise; so when A. says to B., 'I owe the mortgage you hold against me,' the presumption is that he is an honest man, and means at some time in the future to pay the mortgage. The law, therefore, raises an implied promise to pay.

"It follows, therefore, from this line of reasoning that a clear and definite acknowledgment of the existence of the contract and liability, whether coupled with a direct promise to pay or not, carries with it an implied promise to pay, and this in a large measure reconciles the cases which hold that there must be a promise to pay with those which hold that it is sufficient to have an unqualified acknowledgment of the existing liability." (Italics ours.)

We had the California statute from 1864 to 1887, but repudiated it in the latter year and adopted the Texas one. In that state it has been held, and as we believe, logically and consistently, from the first to the last that if the action be brought after the bar of the statute has run as against the original contract, whether it be based on a promise made while the remedy on the original contract still existed or after it had been barred, it must be brought on the new promise to pay, and that at all times a mere acknowledgment of the justness of the original debt, which did not carry with it, either express or implied, the promise to pay,

would not toll the statute. We hold, therefore, in harmony with our previous decisions, and particularly with what we have said in *Steinfeld* v. *Marteny, supra,* that in order that a suit may be maintained, when the original obligation is barred by the statute, there must be both an acknowledgment of the debt and an express or implied promise to pay, and the action will necessarily be founded upon the new promise.

The next question is as to the extent to which the acknowledgment must go in identifying the obligation. We have held in *Steinfeld* v. *Marteny, supra,* that where there are several debts and it cannot be determined from the acknowledgment relied upon as to which particular debt it refers to, it is not sufficient. But we think it is not necessary that the acknowledgment itself specifically set up the exact amount and nature of the debt. It is enough if it points ·distinctly and unerringly to a specific obligation. Thus, if reference is made in the acknowledgment to some indebtedness not specified, and it appears from other evidence that there is but one distinct legal indebtedness existing between the parties, that is sufficient to identify it. *Evans* v. *Evans,* (Tex. Civ. App.) 249. S. W. 1097; *Robertson* v. *Warren,* 45 Tex. Civ. App. 584, 100 S. W. 805; *Cornforth* v. *Smithard,* 5 Hurl. & N. 13, 157 Eng. Reprint, 1081; *Woodbridge* v. *Allen,* 12 Metc. (Mass.) 470; *Wright* v. *Parmenter,* 23 Misc. 629, 52 N. Y. Supp. 99.

With these general provisions of law to guide us, let us consider the letters relied on by plaintiff to see whether they are sufficient to toll the statute or not. The letter of March 17th from plaintiff to defendant says, ''May we call to your attention at this time the balance on your account on which no remittance has been received in some time.'' In the letter of December 5th, the plaintiff again says, ''We have not had a remittance from you to liquidate your indebtedness

to John W. Masury & Son of California.'' Defendant, on December 9th, refers to this letter of December 5th, and says: ''We still have a large stock on hand and we feel we are entitled to some adjustment on this account.'' We are of the opinion that since the record shows that there was but one account existing between John W. Masury & Son of California and defendant, being one for merchandise sold, and since there was a balance admittedly due thereon when the transactions between defendant and that company ceased in 1930, the indebtedness referred to by the various letters in evidence was sufficiently identified to bring it within the rule of *Steinfeld* v. *Marteny, supra.*

Let us consider the second question, whether the acknowledgment admits the justness of the debt. The word ''justness'' is defined as being ''conformity to truth, propriety, accuracy, or the like.'' Webster's New International Dictionary. We have been unable to find any cases where the phrase ''justness of the debt'' found in the Texas and Arizona statutes has been specifically construed. It might be argued that the reference was to the *legal collectibility* of the obligation and that if a man admitted that, in the absence of the statute of limitations, a judgment for the amount of the debt could be obtained against him, even though he felt, for one reason or another, there was no moral obligation upon him to pay it, that would be considered as an acknowledgment within the meaning of the statute. On the other hand, it might well be said that since the only connection of the original indebtedness with the new cause of action is that it furnishes a moral consideration, that the word implies the debtor must feel there is a *moral obligation* upon him to pay the account, even though it cannot be enforced legally. In other words, does the phrase refer to the moral or the legal obligation? We are

of the opinion that in view of the relation of the original obligation to the new one the word "justness" refers to the moral obligation which the debtor feels rests upon him, rather than the strict legality of the original claim. We have examined many cases wherein acknowledgments of an indebtedness were construed, and in every case where it was held that the debtor had acknowledged the debt sufficiently to toll the statute, there was an admission of moral obligation to pay, and not one of legal obligation only, accompanied by a denial of the moral debt. We hold, therefore, that an acknowledgment to be within the statute must contain, directly or impliedly, an expression by the debtor that a moral obligation rests upon him to pay the original debt. On examining the letters in question, it is apparent from the first that the defendant at all times insisted that because of the fact that the firm which originally sold it the paints in question, had gone out of business, it was left with a broken line of merchandise so that the goods were not, in realty, worth to it what it had agreed to pay for them in the first place and that it felt it should not be required to pay the full amount of the indebtedness. We think this was, in effect, a denial of the justness of the balance due on the original account, within the meaning of the statute. But even more than this, taking the most liberal construction of the letters, under the doctrine of implied promise to pay, we think it is clear that at no time did the defendant ever promise or intend to promise that it would pay the debt as contracted originally, but rather that it refused to do so, and that it would only pay such a sum thereon as was mutually agreed upon, taking into consideration its loss by the discontinuance of the line of paints it had been purchasing, and in its final letter, which, for the first time, contained a definite offer on the part of defendant, it was either to pay 25 per cent.

of the balance of the account in question, or to return to plaintiff enough of its paints—presumably at the purchase price thereof—to settle the account in full. As we have said before, when the offer to pay is upon certain conditions, the plaintiff must accept the conditions as offered and prove their performance in order to recover on the new promise. There is no contention that this was done.

Counsel for plaintiff have urged most strenuously the injustice of permitting a debtor who knows that he owes a debt to escape from the paying thereof by a technical interpretation of the statute. He says:

" . . . Our laws are intended to do justice, not to be misconstrued and thereby defeat the rights of honest individuals. Leniency, fairness and trust have always been considered meritorious attributes but what a premium this defendant would place upon those merciful qualities. 'A Court should not *and will not* go out of its way to give its benefit to a man who seeks to take advantage of the leniency of his creditor to defeat the collection of a just debt which he admits has never been paid.' The Court should encourage debtors paying their obligations and should not permit them to write letters lulling their creditors into a feeling of false security—and when suit is filed, permit him to come into court and defeat recovery on a statute of limitations. We do not believe that is the law of the land and have found no such authority."

We think this is answered by the following quotation from *Bell* v. *Morrison, supra*:

"We adhere to the doctrine thus stated, and think it is the only exposition of the statute, which is consistent with its true object and import. If the bar is sought to be removed by the proof of a new promise, that promise, as a new cause of action, ought to be proved in a clear and explicit manner, and be in its terms unequivocal and determinate; and, if any con-

ditions are annexed, they ought to be shown to be performed.

"If there be no express promise, but a promise is to be raised by implication of law from the acknowledgment of the party, such acknowledgment ought to contain an unqualified and direct admission of a previous, subsisting debt, which the party is liable and willing to pay. If there be accompanying circumstances, which repel the presumption of a promise or intention to pay; if the expression be equivocal, vague, and indeterminate, leading to no certain conclusion, but at best to probable inferences, which may affect different minds in different ways; we think they ought not to go to a jury as evidence of a new promise to revive the cause of action. Any other course would open all the mischiefs against which the statute was intended to guard innocent persons, and expose them to the dangers of being entrapped in careless conversations, and betrayed by perjuries.

"It may be that in this manner an honest debt may sometimes be lost, but many unfounded recoveries will be prevented; and viewing the statute in the same light, in which it was viewed by English Judges at an early period, as a beneficial law, on which the security of all men depends, we think its provisions ought not to be lightly overturned; and that no creditor has a right to complain of a strict construction, since it is only by his own fault and *laches* that it can be brought to bear injuriously upon him.''

The judgment of the superior court of Cochise county is affirmed.

McALISTER, C. J., concurs.

ROSS, J., concurs in the result.