Grady Carroll **OUZTS**, Plaintiff-
Appellant,

v.

**MARYLAND  NATIONAL  INSURANCE
COMPANY et al.,** Defendants-
Appellees.

No. 26062.

United States Court of Appeals,
Ninth Circuit.

Oct. 29, 1974.

Phill Silver, Hollywood, Cal., for plaintiff-appellant.

Keith Edwards (argued), of Parraguirre, Rose, Pico & Norwood, Las Vegas, Nev., for defendants appellees.

Michael B. Weisz (argued), Legal Aid Society of San Diego, San Diego, Cal., and Richard A. Weisz (argued), Legal Aid Foundation of Long Beach, Long Beach, Cal., for amicus curiae in support of appellant.

Noble K. Gregory (argued), of Pillsbury, Madison & Sutro, San Francisco, Cal., George R. Richter, Jr., of Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal. (argued), for amicus curiae in support of appellees.

Before CHAMBERS, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE and SNEED, Circuit Judges.

## OPINION

TRASK, Circuit Judge:

This case as a decision of a panel of the court is reported at 470 F.2d 790 (9th Cir. 1972). Following that decision, en banc proceedings were initiated resulting in a determination to rehear the case en banc. Additional briefs were filed by counsel of record and by amici curiae on the issue of state action, and the case was orally reargued.[1] We reaffirm.

---

1. The court expresses its appreciation for counsel who so graciously filed briefs as amici and participated in reargument. They are: Michael B. Weisz, Legal Aid Society of San Diego; Richard A. Weisz, Legal Aid Foundation of Long Beach; and Stefan M. Rosenzweig and Henry S. Hewitt of the Legal Aid Society of Alameda County, all on

The attention accorded the case thus far merits a more complete statement of the facts than heretofore given. In October, 1965, Grady Carroll Ouzts (Ouzts) was arrested in Las Vegas, Nevada, and charged with obtaining money under false pretenses. The Justice Court for the Township of Las Vegas set bail at $2,500.

On November 1, 1965, Defendant William Embry, doing business as "Bill Embry Bail Bonds" (Embry) had Ouzts sign an "Application and Agreement for Appearance Bond or Recognizance" (Agreement) in favor of defendant Maryland National Insurance Company (Maryland National) for which Embry was agent. The defendants, Darrow Peterson and Iola Peterson (the Petersons), executed the agreement as indemnitors.

The Agreement stated that in consideration of Maryland National's approval of the application and execution of a bail bond, during Ouzts' release on bail "any agent of Maryland National Insurance Company shall have control and jurisdiction of him during the period for which the bond is executed and has the right to surrender the defendant at any time that they may desire as provided herein, and as provided by law." The Petersons, as indemnitors, agreed to aid Maryland National in surrendering Ouzts to the court should the surety deem such action advisable.

Pursuant to this documentation, a bail bond in the required amount was executed by Maryland National on behalf of Ouzts, it was approved by the court, and Ouzts was released from custody. Subsequently, in violation of the terms of the bond agreement, Ouzts left the jurisdiction and was located by telephone in South Carolina. At that time he told Embry that he had no intention of returning to Nevada. Eventually, Ouzts went to Long Beach, California, where the events which culminated in this action took place. Meanwhile, Embry was successful in obtaining a continuance of the hearing on the criminal proceedings in Las Vegas. A preliminary hearing had originally been set for May 9, 1966, and was continued until January 9, 1967.

Ouzts alleged that on November 3, 1966, the Petersons came to his home and attempted to take him into custody. He resisted, the Long Beach police were called and the matter was settled when Ouzts voluntarily surrendered to the police for incarceration pending further court proceedings. On the next day Darrow Peterson applied for and obtained a fugitive warrant for the arrest of Ouzts under California Penal Code section 847.5. Bail was set by the Long Beach Municipal Court and a hearing scheduled for November 10, 1966, to determine if the court should authorize Peterson under section 847.5 to return Ouzts to Las Vegas as a fugitive from Nevada. At the hearing, the Long Beach court refused to enter such an order unless Peterson first obtained a warrant from the justice court in Las Vegas. The hearing was continued until December 12, 1966, and Ouzts was released from custody on his own recognizance.

The Petersons returned to Las Vegas and informed Embry of their lack of success. They all then went back to Long Beach and on November 18, without warrant, court order or court approval, hired the defendant Wilfred I. Lagatella to take Ouzts into custody and deliver him to them in San Pedro, California. Lagatella was supplied with the bailbond and a written authorization to act for Maryland National. On Novem-

behalf of the Plaintiff-Appellant, Grady Carroll Ouzts.

George R. Richter, Jr., William M. Burke, and David J. Reber, of Sheppard, Mullin, Richter, & Hampton; on behalf of Defendants-Appellees; Jeffrey Isaacs and Richard B. Munks of Procopio, Cory, Hargreaves & Savitch for Southern California First National Bank in support of Appellees; and Noble K. Gregory, John A. Sutro, Jr., Michael H. Salinsky and Bernard Zimmerman of Pillsbury, Madison & Sutro on behalf of The Bank of California, National Association, in support of Appellees.

ber 18, 1966, Lagatella and an assistant forcibly took Ouzts into custody at his residence in Long Beach and delivered him to Embry and the Petersons in San Pedro. They then transported him to Las Vegas, Nevada, where Ouzts was delivered to the custody of the police. The Las Vegas charges against Ouzts were subsequently dismissed.

Ouzts alleges that his arrest by Maryland National was accomplished by force and violence and that Lagatella and his assistant claimed they were special police officers of Los Angeles County and displayed badges of authority. These contentions were denied by the defendants. It is clear, however, that neither was in fact an officer, special officer or clothed with authority by any official governmental entity.

This action for damages by Ouzts thereafter came before the District Court on an amended complaint basing jurisdiction upon the Civil Rights Act, 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343(3). A second state law claim seeking damages for unlawful extradition was joined under the theory of pendent jurisdiction. The District Court granted a motion for summary judgment in favor of the defendants upon the ground that it lacked subject matter jurisdiction. It seems clear, however, that the reason underlying the ruling was that no federal cause of action was established. The court also dismissed the pendent state law claim. A panel of this court unanimously affirmed upon the ground that the appellant had not established a cause of action under federal law.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendants were acting under color of state law and (2) that their conduct subjected him or caused him to be subjected to a deprivation of some right, privilege or immunity secured by the Constitution of the United States.[2] We recognize at the outset that the "state action" requirement of the fourteenth amendment and the "under color of state law" requirement of section 1983 have been construed by the Supreme Court to be substantially the same. United States v. Price, 383 U.S. 787, 794 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). It is also a truism by now that there is no rigid formula for measuring state action for purposes of section 1983 liability. Rather, it is a process of "sifting facts and weighing circumstances" which must lead us to a correct determination. Reitman v. Mulkey, 387 U.S. 369, 378, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), *quoting* Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Here it is necessary to determine whether the conduct of the appellees in forcibly seizing Ouzts and removing him to Nevada constituted action under the color of state law. We note that purely private conduct, no matter how wrongful, is not within the protective orbit of section 1983. Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). For such conduct the wrongdoer faces potential liability in state courts, but a federal action would not lie under section 1983. In addition, the protection of the fourteenth amendment may not be invoked unless the state has been involved in the deprivation of rights to some *significant* extent. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Reitman v. Mulkey, *supra*, 387 U.S. at 378, 380, 87 S.Ct. 1627.

We begin this analysis with an examination of the nature and source of the bail bondsman's status and authority. The institution of bail itself goes back

2.  42 U.S.C. § 1983 provides as follows:

    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

to the days of pre-Norman England. Note, Bail: An Ancient Practice Re-examined, 70 Yale L.J. 966 (1961). Under the early common law, the bondsman not only undertook the risk of loss of his own property if his principal did not appear, but in some instances, the bondsman was made to suffer the punishment which would have been inflicted upon the prisoner. 2 Pollock & Maitland, The History of English Law 589, 590 (2d ed. 1899). As a result of this responsibility, the common law recognized a bondsman's right to recapture and surrender his principal to authorities without resort to any legal process.

The common law conception of bail was adopted by most American jurisdictions early in the history of the United States. The Constitution itself contains a reference to bail in the eighth amendment, and early American case law also acknowledged the bondsman's common law authority. In Taylor v. Taintor, 83 U.S. (16 Wall.) 366, 371, 21 L.Ed. 287 (1872), for example, the recapture right was recognized:

"When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner." (footnote omitted).

*See also* Carlson v. Landon, 342 U.S. 524, 547, 72 S.Ct. 525, 96 L.Ed. 547 (1952); United States v. Goodwin, 440 F.2d 1152, 1156 (3d Cir. 1971); Fitzpatrick v. Williams, 46 F.2d 40 (5th Cir. 1931); Ex parte Salinger, 288 F. 752, 755 (2d Cir. 1923); In re Von Der Ahe, 85 F. 959 (W.D.Pa.1898).

In Fitzpatrick v. Williams, *supra*, the Fifth Circuit further amplified the nature of the bondsman's authority:

"The right of the surety to recapture his principal is not a matter of criminal procedure, but arises from the private undertaking implied in the furnishing of the bond. In re Von Der Ahe (C.C.) 85 F. 959. It is not a right of the state but of the surety. If the state desires to reclaim a fugitive from its justice, in another jurisdiction, it must proceed by way of extradition in default of a voluntary return. It cannot invoke the right of a surety to seize and surrender his principal, for this is a private and not a governmental remedy. It is equally true that the surety, if he has the right, is not required to resort to legal process to detain his principal for the purpose of making surrender. There is no conflict between the two rights. Extradition can only be exercised by a government at the request of a government. Surrender by bail can be exercised only by the individual, who is bail. The remedies are separate and distinct." *Id*. 46 F.2d at 40–41. Thus, we note that the common law right of the bondsman to apprehend his principal arises out of a contract between the parties and does not have its genesis in statute or legislative fiat. Because it is a contract right it is transitory and may be exercised wherever the defendant may be found.

All of this is not to say, however, that the state may not enter the field and regulate the business and practices of bail bondsmen. California has done precisely that. The appellant directs our attention to two specific statutes dealing with the bondsman's authority to apprehend his principal. These are California Penal Code sections 847.5 and 1301 (West 1970). Both statutes provide the basis for the appellant's claim that the appellees were acting "un-

der color of state law" when they forcibly apprehended him.

Section 1301 was originally enacted in 1872 and was modified slightly over the years until the present version of the statute was adopted in 1965.[3] The statute codifies the bondsman's common law right to arrest his principal in order to surrender him to authorities and to empower any other suitable person to accomplish the arrest. Section 1301, however, requires that any person making such an arrest must deliver the defendant within 48 hours to the appropriate court magistrate, sheriff or police. Failure to comply with this requirement constitutes a crime.

Originally, in accordance with the common law, California made no distinction between California bondsmen and foreign bondsmen, i. e., those who provided bail in another jurisdiction and were simply seeking their principals in California. Both were legally entitled to apprehend their principals pursuant to the terms of section 1301. In 1961, however, California Penal Code section 847.5 was enacted.[4] This section totally

3. California Penal Code section 1301 provides as follows:
"§ 1301. Arrest by bail or depositor for purpose of surrender
For the purpose of surrendering the defendant, the bail or any person who has deposited money or bonds to secure the release of the defendant, at any time before such bail or other person is finally discharged, and at any place within the state, may himself arrest defendant, or by written authority indorsed on a certified copy of the undertaking or a certified copy of the certificate of deposit, may empower any person of suitable age to do so.
"Any bail or other person who so arrests a defendant in this state shall, without unnecessary delay, and, in any event, within 48 hours of the arrest, deliver the defendant to the court or magistrate before whom the defendant is required to appear or to the custody of the sheriff or police for confinement in the appropriate jail in the county or city in which defendant is required to appear. Any bail or other person who arrests a defendant outside this state shall, without unnecessary delay after the time defendant is brought into this state, and, in any event, within 48 hours after defendant is brought into this state, deliver the defendant to the custody of the court or magistrate before whom the defendant is required to appear or to the custody of the sheriff or police for confinement in the appropriate jail in the county or city in which defendant is required to appear.
"Any bail or other person who willfully fails to deliver a defendant to the court, magistrate, sheriff, or police as required by this section is guilty of a misdemeanor.
"The provisions of this section relating to the time of delivery of a defendant are for his benefit and, with the consent of the bail, may be waived by him. To be valid, such waiver shall be in writing, signed by the defendant, and delivered to such bail or other person within 48 hours after the defendant's arrest or entry into this state, as the case may be. The defendant, at any time and in the same manner, may revoke said waiver. Whereupon, he shall be delivered as provided herein without unnecessary delay and, in any event within 48 hours from the time of such revocation.
"If any 48-hour period specified in this section terminates on a Saturday, Sunday, or holiday, delivery of a defendant by a bail or other person to the court or magistrate or to the custody of the sheriff or police may, without violating this section, take place before noon on the next day following which is not a Saturday, Sunday, or holiday."

4. California Penal Code section 847.5 provides as follows:
"§ 847.5 Fugitive admitted to bail in another state; affidavit; hearing; warrant for arrest; order for return; procedure for custody and return.
If a person has been admitted to bail in another state, escapes bail, and is present in this State, the bail bondsman or other person who is bail for such fugitive, may file with a magistrate in the county where the fugitive is present an affidavit stating the name and whereabouts of the fugitive, the offense with which the alleged fugitive was charged or of which he was convicted, the time and place of same, and the particulars in which the fugitive has violated the terms of his bail, and may request the issuance of a warrant for arrest of the fugitive, and the issuance, after hearing, of an order authorizing the affiant to return the fugitive to the jurisdiction from which he escaped bail. The magistrate may require such additional evidence under oath as he deems necessary to decide the issue. If he concludes that there is probable cause for believing that the person alleged to be a fugitive is such, he may issue a warrant for his arrest. The magis-

abrogates the foreign bondsman's common law right to pursue, apprehend and remove his principal from California without resort to process. Instead, section 847.5 interjects a mandatory series of court proceedings into the arrest and removal of a fugitive from bail from another jurisdiction. The foreign bondsman must first appear before a magistrate and submit an affidavit of facts in support of his request for an arrest warrant. Only after a finding of probable cause is made will the warrant issue. Any arrest made by the bondsman thereafter is upon the authority of the magistrate's warrant, and not the bondsman's common law recapture right. Following the arrest, section 847.5 requires an additional evidentiary hearing before the magistrate with the fugitive present. Only then can the bondsman be legally authorized to remove his principal from California. Finally, section 847.5 explicitly states that any arrest of a fugitive *not* made pursuant to such a court order constitutes a crime.

It is apparent that in the instant case the appellees did not even purport to comply with the California statute. They attempted to seize Ouzts upon the authority of their private contract of bail. When he resisted, the police were summoned. At this point the magistrate intervened and attempted to follow the mandate of section 847.5 by ordering a hearing. At the hearing, however, the magistrate refused to issue the necessary order unless the appellees first produced an arrest warrant from Las Vegas. The hearing was accordingly continued. It was during this interim and in *complete violation of the California statute* that Ouzts was forcibly taken to

Nevada by the appellees. Their action was clearly not under the color of California law. In no way did California law authorize, permit, encourage or tolerate the conduct of the appellees. Indeed, section 847.5 expressly condemned and criminalized such conduct. The appellees' action can thus only be described as private conduct attempting the enforcement of a private contract in total defiance of existing state law.

The situation here is therefore clearly distinguishable from the numerous cases cited by the appellant and amici where state action was found within the context of section 1983 and the fourteenth amendment. *E. g.,* Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627 (1967); Robinson v. Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). Although the nature of state action found in each of these cases differs with the facts of the case, they all share a common thread. In each, the Supreme Court found that there was some state involvement which directly or indirectly *promoted* the challenged conduct. Similarly, where the Court could find *no* affirmative causal link between state legislation or policy and the challenged conduct, it declined to find the state action necessary to invoke the fourteenth amendment. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 176–177, 92 S.Ct. 1965 (1972). It is evident that the facts involved in the instant appeal present an even stronger case against

---

trate shall notify the district attorney of such action and shall direct him to investigate the case and determine the facts of the matter. When the fugitive is brought before him pursuant to the warrant, the magistrate shall set a time and place for hearing, and shall advise the fugitive of his right to counsel and to produce evidence at the hearing. He may admit the fugitive to bail pending the hearing. The district attorney shall appear at the hearing. If, after hearing, the magistrate is satisfied from the evidence that the person is a fugitive he may issue an order authorizing affiant to return the fugitive to the jurisdiction from which he escaped bail.

"A bondsman or other person who is bail for a fugitive admitted to bail in another state who takes the fugitive into custody, except pursuant to an order issued under this section, is guilty of a misdemeanor."

the finding of state action than those involved in *Moose Lodge, supra.* For not only does California law not "foster" the type of misconduct which resulted, but rather, the applicable statute expressly prohibits and makes criminal the appellees' action.

The appellant attempts to argue, however, that the appellees merely "exceeded" the authority otherwise granted the bondsman under California law. In this manner the appellant hopes to bring himself within the ambit of Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), and related cases involving action in excess of authority.[5] In each of these cases, however, the offenders were either actual state officials, as in *Screws, Classic* and *Griffin,* or they were jointly engaged in activity with actual state officials as in *Price* and *Guest.* Such was not the situation in the instant case. The District Court found that "neither the defendants nor their agents held any vestige of authority from any state or any political subdivision thereof." Quite clearly, there was no authority for the appellees to "exceed" here, since California law never clothed them with any authority initially. Rather, with the enaction of section 847.5, California completely terminated the foreign bondsman's common law recapture right.

■ Relatedly, appellant calls attention to the fact that Lagatella and his companion allegedly represented themselves to be "special officers of Los Angeles County."[6] The appellant implies that this representation imbued the appellees' action with the "color of state law." Even assuming that Lagatella made the false representation (a matter which was controverted), we do not perceive how Lagatella's statement alone would support a finding of state action. In Warren v. Cummings, 303 F.Supp. 803 (D.Colo.1969), the court rejected precisely this argument saying:

"Plaintiff's contention that defendant Robertson acted under the color of state law is grounded, in part, upon Robertson's identification of himself as some sort of law enforcement officer, even though Robertson was not, in fact, any type of officer. This basis is clearly insufficient. The Civil Rights Act requires some vesting of authority by the state, and defendant's self-proclaimed authority will not suffice." *Id.* at 804.

■ We note only one other contention made by the appellant. At oral argument the suggestion was made that the bondsman was acting as an unofficial agent or partner of the Nevada court when it sought to bring Ouzts to justice. It is therefore claimed that as "an arm of the court," the appellees became clothed with some of the court's official authority. No precedent is offered to support this strange thesis. Legally, we note that the court has its own official arms for securing the presence of a fugitive defendant. Moreover, the system of extradition which is avail-

5. *E. g.* United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); United States v. Price, 383 U.S. 787, 86 S.Ct. 1152 (1966); Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964); and Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951).

6. Lagatella filed an affidavit in which he denied that any such representation was made. In addition, he stated in his affidavit that neither he nor his companion were public officers of any kind. This latter statement was not controverted.

Although the court made no finding on the question of the disputed representation, the three findings made upon actual authority are as follows:

"2. That the plaintiff has failed to allege that the defendants or their agents were in fact endowed with authority to act in behalf of any state or political subdivision thereof.

"3. That neither the defendants nor their agents were empowered by any state or political subdivision thereof.

"4. That neither the defendants nor their agents held any vestige of authority from any state or any political subdivision thereof."

able to the state is completely "separate and distinct" from the private reclamation interests and procedures of the bondsman. Fitzpatrick v. Williams, *supra*. Practically, we also know that the bail bondsman is in the business in order to make money and is not acting out of a high-minded sense of devotion to the administration of justice. We believe that the bondsman here was acting accordingly. As observed in People v. Houle, 13 Cal.App.3d 892, 895, 91 Cal. Rptr. 874 (1970), the bondsman was acting "to protect his own private financial interest and not to vindicate the interest of the state."

We find no state action here to support a claim under 42 U.S.C. § 1983 and again affirm the judgment of the trial court.[7]

HUFSTEDLER, Circuit Judge, dissenting, with whom Circuit Judges BROWNING, DUNIWAY and ELY concur:

I cannot agree that Ouzts has failed to allege sufficient facts to entitle him to a trial on the merits of his claim that defendants acted under color of state law to deprive him of federally protected rights, in affirming the district court's dismissal of Ouzts' civil rights action, the majority ignores well-established Su-

preme Court authority and threatens to frustrate the congressional purpose underlying enactment of section 1983's provision for an expansive, comprehensive remedy for the deprivation of federal constitutional and statutory rights. (*See generally* Adickes v. S. H. Kress & Co. (1970) 398 U.S. 144, 162–169; *id.* at 203–206, 90 S.Ct. 1598 (Brennan, J., concurring in part and dissenting in part).)

I.

The pleadings and affidavits filed prior to the district court's dismissal of Ouzts' section 1983 action, viewed in the light most favorable to Ouzts' claim,[1] indicate that Ouzts was arrested in Las Vegas, Nevada, in October 1965 on a charge of obtaining money under false pretenses. Ouzts was released three days later, after Maryland National Insurance Company, through William Embry, its attorney-in-fact, executed a bail bond on Ouzts' behalf; the Petersons signed Ouzts' bail application as resident guarantors.

On May 9, 1966, by stipulation of counsel, the preliminary hearing on the criminal charge was continued to January 1967; the court ordered the bond to continue. On November 3, 1966, allegedly acting in furtherance of an agree-

7. The appellant focused the attention of the court on section 1983 exclusively. No explicit reference was made to the applicability of section 1985 either in the pleadings below or in argument to this court on appeal. We therefore decline to consider that issue now. Roberson v. United States, 382 F.2d 714, 718 (9th Cir. 1967).

1. The district court's dismissal of Ouzts' section 1983 claim followed its grant of appellees' motion for summary judgment. Before ruling, therefore, the district court was able to consider not only Ouzts' amended complaint, but also affidavits filed by both the defendants and Ouzts. Summary judgment may be granted in these circumstances only if the pleadings, together with the affidavits submitted, show that there is no genuine issue as to any material fact and that the defendants are entitled to a judgment as a matter of law. (Fed.R.Civ.P. 56(c).) Because Ouzts and the defendants do not agree entirely on the factual allegations underlying

Ouzts' claim, summary judgment for the defendants is proper only if these disputes are immaterial—that is, the district court's grant of summary judgment can be affirmed only if the defendants are entitled to judgment as a matter of law when all disputed factual issues are resolved in favor of Ouzts. (*See, e. g.*, Adickes v. S. H. Kress & Co., *supra*, 398 U.S. at 157, 90 S.Ct. 1598, United States v. Diebold (1962) 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176. *See generally* 6 J. Moore, Federal Practice ¶¶ 56.15 [1.–0], 56.15 [3] (2d ed. 1974).) Accordingly, in evaluating the sufficiency of Ouzts' claim, we must consider the facts alleged in the light most favorable to Ouzts. In so doing, of course, I indicate no view as to the likelihood that at a trial on the merits Ouzts would be able to convince the factfinder that his version of the relevant events is correct and that he therefore is entitled to a judgment against the defendants.

ment between Embry and the Petersons, Darrow and Iola Peterson forcibly entered Ouzts' home in Long Beach, California. Ouzts was compelled to accompany the Petersons from his home by threats of violence. Eventually the police were called; Ouzts was arrested and jailed pending a determination of his fugitive status. Darrow Peterson then sought an order, pursuant to Cal.Penal Code § 847.5, authorizing him to return Ouzts to Nevada by filing a false affidavit stating that Ouzts was in fact a fugitive from justice. After a hearing, the Long Beach Municipal Court refused to order Ouzts' extradition unless Peterson obtained a Nevada warrant for Ouzts' arrest. Ouzts was then released on his own recognizance; the case was continued and eventually dismissed without any further appearance by the defendants.

Following the refusal of the Long Beach court to authorize Ouzts' return to Nevada, defendants hired Wilfred Lagatella, a self-employed bail bond "skip tracer," to aid in their attempt to transport Ouzts to Nevada. To accomplish this purpose, on November 18, 1966, Lagatella and an associate forcibly entered Ouzts' home to arrest him. Lagatella admitted that in entering the home and effecting the arrest, he relied on the authority vested in bail bondsmen by Cal. Penal Code § 1301 to re-arrest a principal. Ouzts alleges that Lagatella flashed a badge and told him that he and his companion were "special officers" of Los Angeles County.[2] Using a great amount of force, the two men subdued Ouzts, handcuffed him, and transported him against his will to San Pedro, California, although they initially told him that he was being taken to the Long Beach police department. Embry and the Petersons were waiting at San Ped-

ro, and they then forced Ouzts to accompany them to Las Vegas.

Upon arrival in Las Vegas, Ouzts was jailed by the sheriff, whe relied upon defendants' false allegations that Ouzts was a fugitive from justice. Ouzts remained in custody from November 18 to November 29, 1966. The pending criminal complaint against Ouzts was dismissed on January 6, 1967, before Ouzts received any hearing on the charge.

## II.

Apparently conceding that, if true, Ouzts' amended complaint and affidavit establish a right to some form of relief against the defendants, the majority nevertheless affirms dismissal of his section 1983 action on the ground that Ouzts has failed to allege sufficient facts to permit a finding that the defendants were acting under color of state law when they violated Ouzts' civil rights. I believe that the governmental nature of the bail system in general, California's and Nevada's comprehensive statutory scheme for licensing and regulating bail bondsmen, and, in particular, California's grant to bail bondsmen of police powers not enjoyed by private citizens generally, together with the fact that defendants expressly relied upon their statutory powers in effecting the second arrest and informed Ouzts at that time that they were special Los Angeles County officers, compel the conclusion that defendants were acting under color of state law.

It is now well-settled that to satisfy the "under color of" requirement of section 1983, the involvement of the state need not be either exclusive or direct. (E. g., United States v. Guest (1966) 383 U.S. 745, 755, 86 S.Ct. 1170, 16 L. Ed.2d 239.)[3] In evaluating Ouzts' allegations that defendants acted under col-

---

2. Because Ouzts alleged that in entering his home and forcibly removing him Lagatella was acting pursuant to an agreement with the other defendants, Lagatella's conduct, including his alleged announcement of his "special officer" status, is attributable to the other defendants for the purpose of determining whether they acted "under color

of" state law. (See United States v. Price (1966) 383 U.S. 787, 794, 86 S.Ct. 1152.)

3. United States v. Guest involved a determination of the sufficiency of a criminal indictment under 18 U.S.C. § 241, rather than a civil action under 42 U.S.C. § 1983. Because the majority of the Court interpreted § 241 as incorporating no more than the

or of state law, accordingly, the critical question is not whether defendants were in fact public officials, but rather whether the state "significantly involved itself" with defendants' unlawful conduct. (Moose Lodge No. 107 v. Irvis (1972) 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627; Reitman v. Mulkey (1967) 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830.) Whether or not state involvement is "significant," of course, can be determined only "by sifting facts and weighing circumstances." (Burton v. Wilmington Parking Authority (1961) 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45.) But the absence of a "precise formula" for recognition of the degree of state involvement in private conduct necessary for an action under section 1983 does not leave us free to find the presence or absence of state action without regard to the many cases from the Supreme Court that indicate which factors are relevant to a determination of the state action question.

In a variety of contexts the Supreme Court has found state action of a nature sufficient to create rights under the Fourteenth Amendment even though the official conduct was only one of several cooperative forces leading to the constitutional violation. (United States v. Guest, *supra,* 383 U.S. 755–756, 86 S.Ct. 1170; *see e. g.,* Adickes v. S. H. Kress & Co., *supra;* Evans v. Newton (1966) 382 U.S. 266, 86 S.Ct. 486, 15 L.Ed.2d 373; Shelley v. Kraemer (1948) 334 U.S. 1, 68 S.Ct. 836.) This form of official conduct is present in the case at bar, for only through substantial governmental cooperation is it possible to maintain the system of quasi-private bail that led to the violation of Ouzts' civil rights. State officers are responsible for determining whether an offender is eligible for bail and, if he is, a magistrate or judge both sets the amount of bail required for release and determines the form of bail that the surety will be al-

lowed to deposit. (*See, e. g.,* Cal.Penal Code §§ 1270–1272, 1275, 1298; Nev. Rev.Stat. §§ 178.484, 178.498, 178.502.) In addition, judicial officers are empowered to impose conditions on both the surety and the principal to insure the principal's appearance in court (*see, e. g.,* Nev.Rev.Stat. § 178.502; *cf.* Cal.Penal Code §§ 1273, 1292), and, when deemed necessary, to revoke bail and order recommitment of the defendant. (*See, e. g.,* Cal.Penal Code § 1310; Nev. Rev.Stat. 178.506, 178.532.) Perhaps of greater importance, as demonstrated in at least two instances in the case at bar, state police and judicial officers make available to bail bondsmen judicial process and the coercive power of the state to aid in rearrest and detention of the principal, in order to protect the surety's investment. (*See, e. g.,* Cal.Penal Code §§ 847.5, 1300–1301. *See generally* ABA Project on Standards for Criminal Justice, Standards Relating to Pretrial Release § 5.4 (Approved Draft 1968).)

Moreover, state involvement in the bail system does not inure solely to the benefit of the private bondsman. By permitting a defendant to be released into the custody of a private surety, the state saves the expense that it would otherwise incur in constructing additional jail facilities, feeding and clothing the prisoner, and using its own governmental personnel to guard the defendant and insure his appearance in court. In maintaining custody over a defendant, therefore, the bail bondsman is performing an important public function, as the Supreme Court has recognized on several occasions: "When bail is given the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment." (Taylor v. Taintor (1872) 83 U.S. (16 Wall.) 366, 371, 21 L.Ed. 287.) "When a prisoner is out on bond he is still under court control, though the bounds of his confinement are enlarged.

equal protection clause of the Fourteenth Amendment (383 U.S. at 754, 86 S.Ct. 1170), the Court had to consider whether

the criminal complaint sufficiently alleged that the defendants had acted under color of state law.

His bondsmen are his jailers." (Carlson v. Landon (1952) 342 U.S. 524, 547, 72 S.Ct. 525, 738, 96 L.Ed. 547.) [4]

The importance of the public function performed by bail bondsmen is evidenced by the pervasive regulation of the industry by the state. (Cf. Evans v. Newton, supra, 382 U.S. at 301–302, 86 S.Ct. 486. See generally Public Util. Comm'n v. Pollak (1952) 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068.) Both California and Nevada require that bail bondsmen be licensed by the state and both set stringent qualification requirements for license applicants. Each state requires extensive record keeping and each places strict limitations on the business practices and range of services that can be offered by licensed bail bondsmen. Fee schedules are established by the state, and filing of a personal bond is required. In addition, both California and Nevada provide criminal penalties for violations of the licensing regulations.[5]

In short, the state-licensed and regulated bondsman is an integral part of the state's program of pretrial release. The state, through its law enforcement and judicial officers, and private sureties are joint participants in the present system of bail, "insinuated itself into a position of interdependence," so that conduct that flowed naturally from that system "cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." (Burton v. Wilmington Parking Authority, supra, 365 U.S. at 725, 81 S. Ct. at 862.)

Finding a sufficient allegation of state action in the case at bar, however, does not depend solely on the overall governmental nature of the bail bond system or on the mutual benefits enjoyed because of state-private surety co-operation. Similarly, although state restriction of entry into the bail bondsman profession and comprehensive regulation of general business practices make finding state action substantially easier, it too need not be deemed "significant" state involvement in order to sustain Ouzts' allegations that defendants acted under color of state law. On the other hand, a finding of state action is compelled when these factors are considered together with the fact that California has delegated to bail bondsmen coercive state police powers not enjoyed by private citizens generally and that the defendants both relied upon that statutory authority and informed Ouzts of their "special" status when they forcibly entered his home and transported him to Nevada against his will. (Griffin v. Maryland (1964) 378 U.S. 130, 84 S.Ct. 1770; Williams v. United States (1951) 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774.)

California has vested in defendants, through Cal.Penal Code § 1301, the coercive power of the state. Unlike the limited authority possessed generally by private citizens to arrest for public offenses committed in their presence or when a felony has actually been committed (Cal.Penal Code § 837), under ssction 1301 bail bondsmen and their agents are authorized to arrest a defendant free on bond at any place in California, at any time before the surety has been discharged.[6] This delegation of police power played an essential role in

---

4. See also Hearings on S. 2855 Before the Subcomm. on Constitutional Rights & Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 89th Cong., 2d Sess. 6 (1966) (statement of Sen. Ervin): "[I]n modern times, the bail bondsman is an arm of the court performing a service in aid of civil law. As such, he should be subject to procedures that recognize and protect the rights of the accused as much as do other agents of law enforcement."

5. The California statutory provisions relating to licensing of professional bail bondsmen and regulation of their business practices are contained in Cal.Insurance Code §§ 1800–1822. At the time Ouzts was released on bail, the Nevada licensing and regulatory provisions were codified in sections 685.-210–685.300 of the Nevada Revised Statutes. The Nevada provisions were recodified in 1971 without any significant modification, and are presently found in Nev.Rev.Stat. §§ 697.010–697.370.

6. California has by statute delegated this arrest power to bail bondsmen for more than 120 years. (See Cal.Stats.1851, c. 29, p. 271, § 533.)

defendants' unlawful conduct. Defendant Lagatella acknowledged that he was expressly relying on the arrest power authorized by section 1301 when he entered Ouzts' home and forced Ouzts to accompany the other defendants to Nevada.[7] In addition, after he entered the home, Lagatella allegedly flashed a badge and informed Ouzts that he was a special officer of Los Angeles County. Lagatella also told Ouzts that he was taking Ouzts to the Long Beach police department in connection with the events that led to the unsuccessful section 847.5 proceedings.

More than sixty years ago the Supreme Court held that state involvement in private activity reached the requisite level of "significance" for a finding of state action "if the commission of the wrong itself is rendered possible or is efficiently aided by the state authority lodged in the wrongdoer." (Home Tel. & Tel. Co. v. Los Angeles (1913) 227 U. S. 278, 287, 33 S.Ct. 312, 315, 57 L.Ed. 510.) It seems to me to be beyond dispute that the authority to arrest Ouzts conferred on defendants by section 1301 and expressly invoked by Lagatella "efficiently aided" the defendants in their efforts to remove Ouzts to Nevada. Accordingly, the *Home Telephone* standard requires that we hold that the defendants forcibly entered Ouzts' home, arrested him, and transported him to Nevada "under color of" state law. (*See,* United States v. Classic (1941) 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368: "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.")

In Griffin v. Maryland, *supra,* the state action decision with the greatest factual similarity to the case at bar, the Supreme Court utilized the principle enunciated in *Home Telephone* and United States v. Classic to find state action in the discriminatory conduct of a private detective enforcing the racially restrictive policies of a private amusement park. In making its state action determination, the Court emphasized the same three factors that are central to Ouzts' claim: Detective Collins, pursuant to a county ordinance, had been vested with police powers not possessed by private citizens although he legally remained an agent of his private employer (378 U.S. at 132 & n. 1, 84 S.Ct. 1770); in performing the unlawful conduct, Collins "purported to exercise the authority of a deputy sheriff" (*id.* at 135, 84 S.Ct. at 1772; emphasis added); and Collins had a badge which he displayed as evidence of his purported state authority (*id.*). After summarizing these facts, the Court held: "If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law." (*Id. See* Williams v. United States, *supra,* 341 U.S. at 99–100, 71 S. Ct. at 578: "It is common practice (citations omitted) for private guards or detectives to be vested with policemen's powers. We know from the record that [this] is the policy of Miami, Florida. . . . [T]he manner of [Williams'] conduct of the interrogations makes clear that he was asserting the authority granted him and not acting in the role of a private person." (Citations omitted.).)

---

7. Defendants' admission that § 1301 was expressly relied upon in effecting Ouzts' arrest is of substantial importance for a finding of state action. Knowledge of and action pursuant to a state statute is an "essential" element in a finding that a person has acted under color of a state statute for purposes of 42 U.S.C. § 1983. (Adickes v. S. H. Kress & Co., *supra,* 398 U.S. at 161–162 n. 23, 174 n. 44; *Id.* at 212, 90 S.Ct. at 1610–1611 n. 23, 1617 n. 44; *Id.* at 1631 (Brennan, J., concurring in part and dissenting in part): "A private person acts 'under color of' a state statute or other law when he, like the [public] official, in some way acts consciously pursuant to some law that gives him aid, comfort, or incentive.")

It is of course true that California law does not authorize bail bondsmen to engage in the brutal conduct to which Ouzts allegedly was subjected. There is even some question, apart from the unreasonable use of force to subdue Ouzts and transport him to Nevada, as to the extent to which defendants could properly rely on the statutory authority granted by section 1301. (*Compare* Cal.Penal Code § 1301 *with id.* § 847.5.) But the fact remains that under California law bail bondsmen have been delegated specific police powers and it was pursuant to this grant of authority that defendants acted in attempting to return Ouzts to Nevada. The Supreme Court long ago laid to rest the notion that defendants, acting pursuant to a grant of authority from the state, ceased to be acting under color of law when they exceeded the scope of their legal authority: "[T]he theory of the [Fourteenth] Amendment is that where an officer or other representative of a state, in the exercise of the authority with which he is clothed, misuses the power possessed to do a wrong forbidden by the Amendment, inquiry concerning whether the state has authorized the wrong is irrelevant, and the Federal judicial power is competent to afford redress for the wrong by dealing with the officer and the result of his exertion of power." (Home Tel. & Tel. Co. v. Los Angeles, *supra*, 227 U.S. at 287, 33 S.Ct. at 315. *Accord*, Monroe v. Pape (1961) 365 U.S. 167, 183–187, 81 S.Ct. 473, 5 L.Ed.2d 492; United States v. Classic, *supra*, 313 U.S. at 325–326, 61 S.Ct. 1031.) Accordingly, although the specific acts which constitute the alleged violation of Ouzts' civil rights were not authorized by California law, we must find that defendants' actions were taken "under color of" state law because California vested in defendants specific police powers upon which they relied and which made possible the challenged conduct. (Home Tel. & Tel. Co. v. Los Angeles, *supra*, 227 U.S. at 287, 33 S.Ct. 312; Griffin v. Maryland, *supra*, 378 U.S. at 135, 84 S. Ct. 1770.)

Although the various indicia of state action are closely related, the Supreme Court has generally discussed the "under color of" state law requirement in cases that involve primarily only one or another particular aspect of the problem. Nevertheless, it is clear that in determining the "significance" of the state's involvement in defendants' unlawful conduct, we must consider together all the forms of state activity present in the case at bar. (Burton v. Wilmington Parking Authority, *supra*, 365 U.S. at 725, 81 S.Ct. 856.) In other words, we must determine whether the governmental nature of the bail system, the beneficial interrelationship of the state and private sureties in administering that system, the comprehensive regulation of the bail system by the state, and the vesting in bail bondsmen by the state of coercive police powers not possessed by private citizens generally, taken together with the fact that the defendants expressly relied upon their statutory authority and explicitly informed Ouzts that they possessed special state authorization for their conduct, indicate such a substantial governmental involvement in the defendants' unlawful conduct that the conduct possesses the attributes, prominence, or dignity of state action. Whatever the majority might conclude about the "significance" of only one or several of these measures of state involvement, I believe that the presence of all of them in the case at bar leads irresistibly to the conclusion that Ouzts has alleged sufficient facts to permit a finding that defendants acted under color of state law.

III.

In his amended complaint and subsequent affidavit, Ouzts alleged that on several occasions defendants forcibly entered his home without consent and without a warrant, restricted his liberty of movement by threats of physical violence, and finally succeeded in transporting Ouzts against his will from California to Nevada, again through use of force and without a warrant. Once it is

recognized that defendants in entering Ouzts' home and forcibly seizing his person were acting under color of state law, it should be readily apparent that Ouzts has alleged that he was deprived of Fourteenth Amendment rights protected by section 1983.

In Monroe v. Pape, *supra*, the Supreme Court held that petitioners' claims that defendants invaded their home and arrested and detained Mr. Monroe, all without a warrant, sufficiently alleged facts constituting deprivation of rights, privileges, or immunities secured by the Constitution to fall well within the ambit of section 1983. (*Id.* at 170–171, 81 S.Ct. 473.) In *Monroe*, as in *Ouzts*, the gravamen of the complaint was that the defendants had violated plaintiffs' right to be free from unreasonable searches and seizures. *Monroe* thus clearly stands for the principle that alleged violations of the Fourteenth Amendment guarantee of due process of law, as it incorporates specific Bill of Rights protections, are actionable under section 1983. Similarly, in United States v. Price, *supra*, the Court held that allegations of deprivation of liberty without due process of law constituted sufficient claim of denial of federally protected rights to fall within the compass of the Civil Rights Act.[8] Indeed, we could not hold that Ouzts has failed to allege a violation of federally protected rights without patently ignoring a still-expanding line of controlling Supreme Court authority. (*See, e. g.*, Griffin v. Breckenridge (1971) 403 U.S. 88, 103, 91 S.Ct. 1790, 29 L.Ed.2d 338; Scheuer v. Rhodes (1974) 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90.)

Although Ouzts has plainly alleged that the defendants acted in violation of California law, the availability of a state remedy does not alter the fact that Ouzts has also alleged that defendants deprived him of his constitutional rights, nor does it affect his right to proceed in federal court under section 1983: "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court." (Monroe v. Pape, *supra*, 365 U.S. at 183, 81 S.Ct. at 482.)

Because I believe that well-established Supreme Court authority requires us to hold that Ouzts' amended complaint and subsequent affidavit sufficiently allege that defendants acted under color of state law to deprive him of federally protected rights, I would reverse the district court's dismissal of Ouzts section 1983 action and remand for a trial on the merits.[9]

MERRILL, Circuit Judge (dissenting):

I cannot agree with Judge Hufstedler that the defendants acted under color of California law or that California has vested or purported to vest them with state power. They were Nevada bondsmen and had no authority in California save to secure California assistance upon complying with prescribed procedures— a course they failed to follow.

8. *Price* involved a determination of the sufficiency of a criminal indictment under 18 U.S.C. § 242, rather than a private action under 42 U.S.C. § 1983. It has been held repeatedly, however, that § 1983 is the civil counterpart of § 242 and that the two sections are to be interpreted similarly. (*See, e. g.*, Monroe v. Pape, *supra*, 365 U.S. at 185, 81 S.Ct. 473.)

9. Because I would hold that the district court erred in dismissing Ouzts' section 1983

claim, I would also hold that it was an abuse of discretion to dismiss his pendent state law claim. Both claims arose from "a common nucleus of operative fact," and there appear to be no jurisdictional considerations that would justify requiring Ouzts to litigate his two claims in separate forums. (UMW v. Gibbs (1966) 383 U.S. 715, 725–727, 86 S.Ct. 1130, 1138–1139, 16 L.Ed.2d 218.)

However, I agree with Judge Hufstedler that as private bondsmen they performed a public function in accepting custody of a released prisoner and guaranteeing the prisoner's return. Professional bondsmen who assume custody of persons released on bail are providing the state with significant assistance in assuring that the manner in which it discharges its responsibilities to those it accuses of crimes, *see generally* Schilb v. Kuebel, 404 U.S. 357, 365, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971); United States ex rel. Keating v. Bensinger, 322 F. Supp. 784 (N.D.Ill.1971), meets constitutional standards. The history of state reliance on private action to assure the return of an accused and the extent to which states have grown to rely on this manner of implementing a system of bail place the bondsman in a position where he "discharges a function or performs a service that would otherwise in all likelihood be performed by the State." Moose Lodge No. 107 v. Irvis, 407 U. S. 163, 175, 92 S.Ct. 1965, 1972 (1972). The close link between that service and the state's obligations to those enmeshed in its criminal process is sufficient, in my view, to impart color of state law to a bondsman's actions in seeking to secure the presence of an accused.[1] The action taken by the defendants in California, then, was, in my judgment, taken under color of Nevada law; and to the extent that civil rights, not waived by agreement between Ouzts and the bondsmen, were violated, a federal claim is stated.

Accordingly I join Judge Hufstedler in dissent.

DUNIWAY, Circuit Judge (concurring):

I concur in the dissenting opinion of Judge Hufstedler. I also concur in the

dissenting opinion of Judge Merrill, insofar as it holds that the action of the defendants was also taken under color of Nevada law.

---

[1]. The majority would hold that this action was private and taken only pursuant to agreement, and that state action would be present in a situation such as this only by the issuance of a bench warrant and the taking into custody of the released person pursuant to the warrant. But I believe it can more accurately be said that the issuance of a warrant is but the second step in a process, taken only if the first step—the attempt of bondsmen to satisfy the state's demand for production of an accused previously released to the bondsmen's authority —is unproductive.