Charles **CULBERTSON** and Helen Culbertson, his wife, Plaintiffs-Appellants,

v.

Alice **LELAND** et al., Defendants-Appellees.

No. 73–1749.

United States Court of Appeals, Ninth Circuit.

Oct. 3, 1975.

## OPINION

Before ELY and CHOY, Circuit Judges, and WEIGEL, District Judge.[*]

WEIGEL, District Judge:

The Arizona Innkeeper's Lien Statute authorizes the keeper of a hotel or lodging house to seize, without notice or judicial procedure, the personal property of a lodger who fails to pay rent. This appeal presents the question whether a private person acting under the authority of the statute does so under color of state law within the meaning of 42 U.S.C. § 1983.

In September 1972, Helen and Charles Culbertson moved into a room in the New Windsor Hotel in Phoenix, Arizona, for which they agreed to pay twenty dollars per week. For several weeks they paid their rent on time, but in November they fell one week in arrears and were evicted by the hotel manager, Alice Leland. At eviction, she seized, as security for the unpaid rent, personal possessions of the Culbertsons which remained in the room. Leland was at no time an official of the State of Arizona. She sought no help from state officials and received none, except that a member of the Phoenix police department told her she had the right to hold her tenants' belongings.

The Culbertsons sued in federal district court for the return of their possessions; for declaratory and injunctive relief against the provisions of the Arizona Innkeeper's Lien Statute (set forth in full in the margin)[1]; and for damages

Victor Aronow (argued), Mesa, Ariz., for plaintiffs-appellants.

Coit I. Hughes (argued), of Hughes, Hughes & Conlan, Phoenix, Ariz., for defendants-appellees.

[*] Honorable Stanley A. Weigel, United States District Judge, Northern District of California, sitting by designation.

1. Arizona Revised Statutes (1956):

§ 33-951. Lien on baggage and property of guests

Hotel, inn, boarding house, lodging house, apartment house and auto camp keepers shall have a lien upon the baggage and other property of their guests, boarders or lodgers, brought therein by their guests, boarders or lodgers, for charges due for accommodation, board, lodging or room rent and things furnished at the request of such guests, boarders or lodgers, with the right to possession of the baggage or other property until the charges are paid.

§ 33-952. Sale of property; notice

A. When baggage or other property comes into the possession of a person entitled to a lien as provided by § 33-951 and remains unclaimed, or the charges remain unpaid for a period of four months, the per-

under 42 U.S.C. § 1983 on the claim that the seizure of their property was made under color of state law and, in the absence of notice and hearing, violated their constitutional right to due process of law. After suit was filed, Leland abandoned her claimed lien and returned the Culbertsons' belongings to them. She and her two co-defendants, the record owner and the beneficial owner of the New Windsor Hotel, then moved to dismiss. The court granted the motion on the ostensible ground that since Leland no longer asserted a lien, any challenge to the Innkeeper's Lien Statute was moot, and that the court lacked jurisdiction. Clerk's Record at 128–29. Subsequently the court also denied a motion to vacate its dismissal order. C.R. at 157. The Culbertsons appeal in forma pauperis.

■ The jurisdictional issue presented by the appeal is easily resolved. If appellants' demand for damages under 42 U.S.C. § 1983 survives, so too does federal jurisdiction. *Lidie v. California,* 478 F.2d 552, 554 (9th Cir. 1973). In their complaint the Culbertsons sought $10,000 compensatory damages for the period for which they were deprived of their medicines and other belongings. That claim is cognizable under 42 U.S.C. § 1983, *Donovan v. Reinbold,* 433 F.2d 738, 743 (9th Cir. 1970), and it remains a live issue despite Leland's renunciation of the claimed lien. It was error to dismiss for lack of jurisdiction. *See* C.R. at 129, lines 12–14.

■ However, if the ground of dismissal was failure to state a cause of action, and if there was such a failure,

the dismissal should be affirmed. *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 249–50, 71 S.Ct. 692, 95 L.Ed. 912 (1951). In this case the district court was concerned with, and requested briefs on, the effects of *Ouzts v. Maryland National Insurance Co.,* 470 F.2d 790 (9th Cir. 1972). *See* Reporter's Transcript at 6–7; Appellees' Brief at 3. (*Ouzts* has subsequently been reheard en banc and has been reaffirmed. 505 F.2d 547 (9th Cir. 1974).) The central issue in *Ouzts* was whether defendants who were not state officials had acted under color of state law. From the emphasis in the briefs below, from the interpretation of appellees (Appellees' Brief at 5–6), and from the district court's oral statements (R.T. at 6–7), it is apparent that what underlay the dismissal here was the conclusion that Leland's actions were not, as a matter of law, taken under color of state law, and thus did not give rise to a federal cause of action under 42 U.S.C. § 1983. We therefore take up that issue.

■ It is settled that § 1983 covers some actions taken by private citizens. The principle established by the Supreme Court, and often repeated, is that

> Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law. *United States v. Classic,* 313 U.S. 299, 325–26, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941).

In factual settings very similar to the present one, one circuit has found state action in a landlord's exercise of a lien

---

son may proceed to sell the baggage or property at public auction, and from the proceeds retain the charges, storage and expense of advertising the sale.

B. The sale shall not be made until the expiration of four weeks from the first publication of notice of the sale, published in a newspaper once a week for four consecutive weeks. The notice shall contain a description of each piece of property, the name of the owner, if known, the name of the person holding the property, and the time and place of sale. If the indebtedness does not exceed

sixty dollars, the notice may be given by posting at not less than three public places located at the place where the hotel, inn, boarding house, lodging house, apartment house or auto camp is located.

C. Any balance from the sale not claimed by the rightful owner within one month from the day of the sale shall be paid into the treasury of the county in which the sale took place, and if not claimed by the owner within one year thereafter, the money shall be paid into the general fund of the county.

against the possessions of a tenant, *Hall v. Garson,* 430 F.2d 430 (5th Cir. 1970), and one circuit has found no state action. *Davis v. Richmond,* 512 F.2d 201 (1st Cir. 1975).

The leading case in our circuit is *Adams v. Southern California First National Bank,* 492 F.2d 324 (9th Cir. 1973), *rehearing en banc denied, cert. denied,* 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974). In *Adams*—the facts of which are outlined below—we held that a private person's use of the self-help repossession provisions of the Uniform Commercial Code, as adopted by the state of California, did not amount to action "under color" of state law, and that therefore a due process challenged to the repossession statutes failed to state a federal cause of action. 492 F.2d at 329. The opinion warned that "[s]tatutes and laws regulate many forms of purely private activity, such as contractual relations and gifts, and subjecting all behavior that conforms to state law to the Fourteenth Amendment would emasculate the state action concept." 492 F.2d at 330–31. The existence of a state statute authorizing certain private action "is not the final answer to the touchstone of state action." 492 F.2d at 330. Equating the "under color" requirement of § 1983 with the state action requirement of the Fourteenth Amendment, *Adams* gauged the repossession activity by the "significant state involvement" test derived from *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). 492 F.2d at 330–31. Because the statute in *Adams* merely codified a right already present in the common law, 492 F.2d at 330, and because the right involved, arising from a written contract, was essentially "a private remedy rather than a [delegated] state power," 492 F.2d at 336, the involvement of the state in enacting the statute was found not significant. On the latter ground *Hall v. Garson, supra,* was distinguished; the authority exercised under the Texas landlord's lien statute was

found to be of a type which "was normally exercised by the State and had historically been a function of the State of Texas." 492 F.2d at 336. It is worth noting that when this court sat en banc to reconsider the state action issue in *Ouzts,* it followed the same approach as *Adams,* focusing on common law antecedents and private contractual rights. *See* 505 F.2d at 550–54.

The transactions in *Adams* were installment purchases of automobiles. The purchasers signed written security agreements which explicitly set forth the sellers' right to repossess on default; and title remained with the sellers. 492 F.2d at 328. The eventual repossessions were only of the chattels covered by the security agreements—the automobiles—and they were performed by the title holders. They were thus as much a matter of private contractual law as of state statute.

The *Adams* holding is limited to repossession of a chattel subject to a specific security agreement. When a creditor, acting solely on the authority of statute, takes possession of a debtor's property which is unrelated to the debt and which is not subject to prior contractual agreement, we cannot say that *Adams* dictates the conclusion that no state action is involved. As in *Adams,* therefore, we must look to the elements of the case to determine whether Arizona has significantly involved itself in the actions of appellee Leland.

### A. *Rights at Common Law*

█ It is apparent that, as in *Davis v. Richmond, supra,* the lien statute here gave Leland a right which she would not have had at common law. At common law only innkeepers—and not hotel, boarding house and lodging house keepers—had a lien on the belongings of their guests.

Beginning in medieval times, an innkeeper had the nearly absolute duty at common law to take in all travelers and to accept their belongings for safekeeping. With minor exceptions he was absolutely liable to his guests for the full

value of those belongings. At the same time, the common law gave him a lien on such property until the bill of its owner was paid. *See generally Klim v. Jones,* D.C., 315 F.Supp. 109, 118–20 and authorities cited. The leading English case is *Mulliner v. Florence,* [1878] 3 Q.B. 484.

Historians debate whether the innkeeper's lien arose in the common law to compensate for the innkeeper's strict duty and liability, or whether it had its origins in a separate, equally venerable custom of the realm. *See, e. g., Hogan, The Innkeeper's Lien at Common Law,* 8 Hastings L.J. 33 (1956). Nevertheless, what passed into American common law with surprising unanimity was the former theory. The Harvard Law Review explained in 1895 that

> As the innkeeper's lien is grounded . . . on the extraordinary liability imposed on him by law, it seems only just that on all goods which he is bound to receive he should have his lien . . . *Note,* 9 Harvard L.Rev. 216 (1895).

*See also* 43 C.J.S. Innkeepers § 26(2)(b); 40 Am.Jur.2d Hotels, Motels, and Restaurants § 187. Under that interpretation of the common law, it was clear to American courts that where the extraordinary liability did not exist, neither did the common law lien. The crux of the matter was the relationship between the guest and the owner of the premises, *Cedar Rapids Investment Co. v. Commodore Hotel Co.,* 205 Iowa 736, 218 N.W. 510, 511 (1928), *Dixon v. Robbins,* 246 N.Y. 169, 158 N.E. 63, 53 A.L.R. 986 (1927); and the innkeeper-guest relationship with its particular duties was an "essential" predicate for the existence of the common law lien. *Brams v. Briggs,* 272 Mich. 38, 260 N.W. 785 (1935). Hotel, boarding house and lodging house keepers had no absolute duty to accept all transient guests and keep their belongings safe; therefore they had no common law lien against those belongings. *See, e. g., Turner v. Priest,* 48 Ga.App. 109, 171 S.E. 881, 882 (1933); *Nicholas v. Baldwin Piano Co.,* 71 Ind.

App. 209, 123 N.E. 226 (1919); *Halsey v. Svitak,* 163 Minn. 253, 203 N.W. 968, 969 (1925); *Jackson v. Engert,* 453 S.W.2d 615, 618 (Mo.App.1970). Several states including Arizona gave them statutory liens to protect them from fraud (*cf. Nance v. O. K. Houck Piano Co.,* 128 Tenn. 1, 155 S.W. 1172, 1173 (1913)), but courts have narrowly construed such statutes and have carefully distinguished between common law and statutory liens. In *Turner v. Priest, supra,* for example, the court explained:

> At common law a boarding house keeper had none of the privileges of an innkeeper, and could not detain the baggage and effects of a delinquent boarder which were in the boarding house. This state and the several states of the Union have passed laws placing boarding house keepers upon the same footing as to the privileges of an innkeeper in detaining the baggage and effects of a delinquent guest to pay for his charges. The lien gave to such innkeepers and boarding house keepers is not created by contract, but by law. Statutes giving to boarding house keepers a lien on the goods of their boarders and the means to enforce the same are in derogation of the common law, and should be strictly construed. [Citations omitted.] 171 S. E. at 882.

The courts of Arizona itself are silent on the common law rights of hotel, boarding house and rooming house keepers. But Arizona has adopted common law rules of decision. Ariz.Rev.Stat. § 1–201; *Howell v. War Finance Corp.,* 71 F.2d 237, 242–43 (9th Cir. 1934); *John W. Masury & Son v. Bisbee Lumber Co.,* 49 Ariz. 443, 68 P.2d 679, 687–88 (1937); *Valley National Bank of Ariz. v. Avco Development Co.,* 14 Ariz.App. 56, 480 P.2d 671 (1971). It has consistently held to the common law since the first legislature of the Arizona territory passed the Howell Code of 1864. *See Boquillas Land & Cattle Co. v. Curtis,* 213 U.S. 339, 345, 29 S.Ct. 493, 53 L.Ed. 822 (1909); *John W. Masury & Son, supra,* 68 P.2d at 686. Following the usual

practice, Arizona looks to the law of sister states where necessary to determine common law principles. *See, e. g., Shulansky v. Michaels,* 14 Ariz.App. 402, 484 P.2d 14, 17 (1971). We must therefore conclude that, in accord with the American rule, hotel and rooming house keepers have no common law lien against the belongings of their guests in Arizona. Whatever lien exists is purely statutory.

■ From the facts of this case, it is clear that appellee Leland did not enjoy the status of innkeeper.

At common law an innkeeper entitled to a lien was one who held out his place as one for the entertainment of all respectable transient persons who chose to come to him. The lien was given largely because of his so holding himself out and his consequent duty to entertain all transients or travelers who offered themselves as guests. [Citation omitted.] It was the transient nature of the entertainment contracted for that distinguished the innkeeper from the lodging house or boarding house keeper. [Citations omitted.] *Cedar Rapids Inv. Co. v. Commodore Hotel Co., supra,* 218 N.W. at 511.

There is no evidence that appellee held herself out to transients, and appellants were not transients; the rented room was their permanent residence. Appellee offered nothing but lodging; "[A] place where travelers could obtain lodging only, without other entertainment, was not an inn." *Dixon v. Robbins, supra,* 246 N.Y. at 172, 158 N.E. at 64, 53 A.L.R. at 987. *See also Cochrane v. Schryver,* 12 Daly (N.Y.) 174 (1883), *Hardin v. State,* 47 Tex.Cr.Rep. 493, 84 S.W. 591 (1905). By the common law standard, appellee was a hotel or lodging house keeper and not an innkeeper. *See generally* Annot., 53 A.L.R. 988; Annot. 19 A.L.R. 517.

*Adams* appears to call for the foregoing investigation of the common law, and it suggests that state action is more likely found where the common law did not permit the action in question. However the common law analysis cannot, by itself, be dispositive. To rely on it alone might, in some cases, be to induce anomalous, technical or outdated results. *Cf. Davis v. Richmond, supra,* 512 F.2d at 203–04. Rather than resting solely on history, we must therefore consider other indicia of state action as well.

**B.** *Relationship of Property to Debt*

The *Adams* holding is limited to *re* possession, and in that context it has been broadly accepted. *See, e. g., Turner v. Impala Motors,* 503 F.2d 607 (6th Cir. 1974), *James v. Pinnix,* 495 F.2d 206 (5th Cir. 1974), *Bichel Optical Laboratories v. Marquette Nat'l Bank,* 487 F.2d 906 (8th Cir. 1974). In adopting it the Fifth Circuit did not see fit to alter its ruling in *Hall v. Garson, supra;* instead it left *Hall* intact and distinguished the *Adams*-type situation on the ground that there "the property seized was the property whose purchase had created the debt and in which the seizor had a security interest." *Calderon v. United Furniture Co.,* 505 F.2d 950, 951 (5th Cir. 1974). The same distinction is appropriate in this case. Special interests of the conditional seller attach to the specific goods which serve as his collateral, interests which are not present in the case of a general debt and indiscriminate seizure of property as collateral. *Cf. Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 607–08, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). Moreover, repossession of the specific chattel giving rise to a debt is an activity much more narrowly confined than general seizures of collateral. The former, particularly where a written instrument defines the rights of the parties, can be left and has traditionally been left to private hands. *See Adams, supra,* 492 F.2d at 336. The latter, because its extent is broad and undefined and because its impact is potentially much more severe, is the type of activity which is a function of the state and over which, ordinarily, the state has a monopoly. *Cf. Shirley v. State National Bank,* 493 F.2d 739, 745–47 (2d Cir. 1974) (Kaufman, C. J., dissenting).

## C.  Private Contractual Remedies

■ Finally, appellants and appellees here had no contractual relationship covering appellants' property, nor does the record show that appellants had any notice or knowledge at the time of renting that appellee Leland could seize their belongings on eviction.  Nothing in the dealings of the parties permits the conclusion that appellants agreed or consented in advance to the seizure, either explicitly or by implication.  In *Adams* the written agreement of the parties set forth their respective rights and liabilities;  the statute there merely reiterated and confirmed their arrangement.  Thus, entirely apart from the statute, the repossession did no violence to the expectations of the debtor, nor did it deprive him of any rights which he had not already yielded voluntarily and for consideration.  In that context the involvement of the state, through its statute, was nearly superfluous.

In the present case, the statute was appellee Leland's sole authority for the seizure, which would not otherwise have been even colorably legal.[2]  And since the statute was the *sine qua non* for the activity in question, the state's involvement through that statute is not insignificant.

For the above reasons, we find that the State of Arizona has significantly involved itself in appellee Leland's seizure of appellants' property, under the standards set forth in *Adams v. Southern California First National Bank, supra.*

We recognize that our decision puts us squarely in conflict with the First Circuit.  The facts in *Davis v. Richmond, supra,* could hardly be closer to the ones in this case.  We agree with the court in *Davis* that "The focus for state action purposes should always be on the impact of the law upon private ordering." 512 F.2d at 204, *quoting* Burke and Reber, *State Action, Congressional Power and Creditors Rights:  An Essay on the Four-*

*teenth Amendment,* 47 S.Cal.L.Rev. 1, 47 (1973).  But we disagree with the proposition that lien statutes which create new rights in favor of creditor landlords have only a minimal impact on private ordering, especially when the parties themselves have failed to agree on a like ordering in the particular case.

*Davis* seems to turn on the judgment of the court that a landlord's seizure of the belongings of an evicted tenant was something to be expected in the ordinary course of private affairs, statute or no; the court described that action as "an obvious and not surprising course." 512 F.2d at 203.  In the circumstances of this case, we find ourselves unable to agree, since we cannot say with confidence that appellants should have expected appellee Leland to do what she did.

The dismissal below is reversed and the case is remanded for further proceedings.

ELY, Circuit Judge (concurring):

I concur in the result reached by Judge Weigel in his carefully studied opinion.  Since I cannot agree, however, with all that Judge Weigel has written, *see infra* n. 5, I have concluded that I should separately state my views.

Acting under the authority conferred by Arizona's innkeeper's lien statutes, Alice Leland seized clothing, food, medicines, and stereo equipment that belonged to her renters, the Culbertsons, in order to satisfy rent claimed by Leland to be unpaid.  Leland owned no security interest in the seized items, nor did she possess any other form of contractual right thereto.  Rather, after informing the Culbertsons that they were evicted from the $20 per week room in which they had been living, she indiscriminately seized and held all of the belongings that remained in the room.  By summarily depriving the Culbertsons of their property, without their consent, in order to satisfy an alleged debt, Leland performed a function that, in my view, belongs only to the state.

---

2.  See section A., *"Rights at Common Law", supra.*

The facts here presented are virtually identical to those in *Hall v. Garson,* 430 F.2d 430 (5th Cir. 1970), in which a landlady, acting pursuant to the Texas landlord's lien statute, seized a television set from a tenant's apartment in order to satisfy the landlady's claim for unpaid rent. Reasoning that the landlady had performed a function indistinguishable from that of executing a judgment, a function that has normally and traditionally been reserved for governmental officers, the Fifth Circuit held that the landlady's action constituted state action. 430 F.2d at 438–40.

In *Adams v. Southern California First National Bank,* 492 F.2d 324 (9th Cir. 1973), *cert. denied,* 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974), our court held that a creditor's repossession of an automobile pursuant to the self-help provisions of the Uniform Commercial Code is not state action. In *Adams,* we expressly distinguished the different facts of *Hall.* We noted that the landlady in *Hall*· had seized property in which she owned no interest, while in *Adams,* creditors had repossessed vehicles in which they held a security interest or ownership rights pursuant to an installment sales contract. Further, we observed that *repossession* of property by a creditor or conditional seller has long been accepted as a private remedy,[1] while, on the other hand, the outright seizure of property unrelated to any alleged debt, which was at issue in *Hall,* had been a function traditionally reserved to the state. 492 F.2d at 335–37.

Since our decision in *Adams,* the Fifth Circuit has had an opportunity to reexamine *Hall* in the context of facts similar to those considered by us in *Adams.* That opportunity arose in *James v. Pinnix,* 495 F.2d 206 (5th Cir. 1974). There, an automobile dealer repossessed a vehicle from a customer to whom he had sold the machine on an installment contract basis. Agreeing with our *Adams* decision, the Fifth Circuit held that such self-help repossession does not constitute state action. The court distinguished *Hall* in much the same way as was done by us in *Adams,* writing that.

> [t]he Hall state function concept does not carry over to the present case with sufficient force to compel a finding of state action. In *Hall* the landlady seized goods to satisfy a debt arising out of an agreement having nothing to do with the goods. Such a taking closely resembles a seizure in satisfaction of a judgment—a function traditionally performed by a sheriff or other state agent. In the present case, by contrast, the appellant-creditor possessed and claimed no roving commission to extract appellee's goods to satisfy a separate debt. Rather, he had a specific purchase money security interest in a particular item, and he seized only that item.

495 F.2d at 208. *See also Calderon v. United Furniture Co.,* 505 F.2d 950 (5th Cir. 1974) (per curiam) (finding the self-help repossession of a washing machine in which the creditor held a security interest to be governed by *James,* rather than *Hall*).

In my view, the principle that has emerged from *Hall* is unquestionably sound. The state has, and must retain, a monopoly over the power to exercise a "roving commission to extract [a debtor's] goods to satisfy a separate debt." *James v. Pinnix, supra* at 208. As held in *Hall* and recognized in *Adams,* such a power has traditionally reposed only in the officers of the state. Furthermore, I hold the firm conviction that the exercise of such a power is so fraught with dangers that it must be retained in the state so that it can be circumscribed by due process protections.[2] Significant

---

1. *Cf. Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 607–08, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (discussing the special interests of the creditor or conditional seller in the specific goods that serve as his security).

2. *Cf. Boddie v. Connecticut,* 401 U.S. 371, 374–75, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Shirley v. State Nat'l Bank,* 493 F.2d 739, 745–47 (2d Cir.) (Kaufman, Chief Judge, dissenting), *cert. denied,* 419 U.S. 1009, 95 S.Ct. 329, 42

perils necessarily attend the arbitrary seizure, even by disinterested state officers, of an alleged debtor's personal belongings. The asserted debt may not be valid, and the seizure may therefore be wholly unjustified. Resistance from the debtor, with concomitant violence, may occur. The property seized may have a value that greatly exceeds the debt, or, on the other hand, the property seized may be essential to the satisfaction of the basic human needs of the alleged debtor and his family. *Cf. Fuentes v. Shevin,* 407 U.S. 67, 80–81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). These perils are not diminished but are undeniably magnified when the state delegates power to conduct such a seizure to the person to whom the debt is allegedly owed.[3] *Cf. Lindsey v. Normet,* 405 U.S. 56, 71, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

There is substantial support in Supreme Court precedent for the application of a public function test, like that applied in *Hall,* to determine whether certain acts of a private party constitute state action. In *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court held that a state regulated, but privately owned, electric utility corporation did not act as the state when it terminated a customer's service because the customer allegedly had not paid her bills. Noting that the State of Pennsylvania, wherein the incident occurred, had no obligation to provide its citizens with electric power, the Court rejected the argument that the utility's action was state action because the utility was performing a public function. The Court left open the possibility, however, that the utility's action could be state action if the utility engaged in functions that were truly those of the state. The Court noted:

> We have, of course, found state action present in the exercise by private entity of powers traditionally exclusively reserved to the State. *See, e. g., Nixon v. Condon,* 286 U.S. 73 [, 52 S.Ct. 484, 76 L.Ed. 984] (1932) (election); *Terry v. Adams,* 345 U.S. 461 [, 73 S.Ct. 809, 97 L.Ed. 1152] (1953) (election); *Marsh v. Alabama,* 326 U.S. 501 [, 66 S.Ct. 276, 90 L.Ed. 265] (1946) (company town); *Evans v. Newton,* 382 U.S. 296 [, 86 S.Ct. 486, 15 L.Ed.2d 373] (1966) (municipal park). If we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one.

419 U.S. 352–53, 95 S.Ct. 454.[4]

Believing that the case at hand falls squarely within the rationale of *Hall,* I

L.Ed.2d 284 (1974). One commentator has observed that *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), seems to endorse the principle that ". . . the power of the state to interfere physically with the status quo may not be delegated in law or fact to private persons." Yudof, *Reflections on Private Repossession, Public Policy, and the Constitution,* 122 U.Pa.L.Rev. 954, 972 (1974). From such a broad view of *Fuentes,* our court has already carved an exception for self-help repossession by a creditor or conditional seller. *Adams v. Southern Cal. First Nat'l Bank,* 492 F.2d 324 (9th Cir. 1973), *cert. denied,* 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974).

3. One can scarcely imagine seizures more egregiously indiscriminate than the one before us now. According to the Culbertsons' complaint, Helen Culbertson is a diabetic and almost totally blind. Among the items that Leland seized were Helen Culbertson's specially-processed diabetic food, prescription medicine for her eyes, and other medicine, prescribed by a veterinarian, for her seeing-eye dog. Leland also seized Charles Culbertson's prescription medicines and special clothing that was required for his job as a cook. None of these items could have had more than minimal resale value; consequently, they could have been of little use to Leland in satisfying the Culbertsons' alleged debt. But they were of critical and undeniable importance to the Culbertsons. I have no doubt that the items would have been exempt from any execution ordered by a state court.

4. The Court's mention of eminent domain as an example of a power "traditionally associated with sovereignty" is, I think, particularly instructive within the context of this case. Like the power exercised here, the power of eminent domain, when conferred by a state on a private party, would enable that party to seize the property of another for his own purposes.

concur in Judge Weigel's conclusion that Leland's seizure of the Culbertsons' property pursuant to the Arizona innkeeper's lien statutes constituted action by the state.[5]

CHOY, Circuit Judge (dissenting):

I respectfully dissent.

In *Adams v. Southern California First National Bank*, 492 F.2d 324 (9th Cir. 1973), *cert. denied*, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974), this court rejected a due process challenge to the self-help repossession provisions of the Uniform Commercial Code. A number of theories had been advanced to establish state action in the statutory authorization of repossession, each of which we rejected. Our discussion in *Adams* of each of these proposed grounds for finding state action is, with one exception, equally applicable to our consideration of Arizona's innkeeper's lien statute. That one exception is the "public function" analysis upon which the Supreme Court relied to invalidate racially discriminatory practices in political party primaries. *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

The Fifth Circuit relied on this public function analysis to find state action and invalidate a landlord's lien in *Hall v. Garson*, 430 F.2d 430 (5th Cir. 1970). The court found that the action taken by the landlord, "the entry into another's home and the seizure of another's property, was an act that possesses many, if not all, of the characteristics of an act of the State." *Id.* at 439. The court quoted from *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941): "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."

The landlady in *Hall* had entered the tenant's apartment, as authorized by the Texas lien statute, and seized a television set as payment for overdue rent. The tenant returned to her apartment and discovered the set gone. Under those facts, I might agree that the landlady was "clothed with the authority of state law," and thus subject to the restrictions of procedural due process. Unlike the landlady in *Hall*, however, Mrs. Leland did not invade the tenants' dwelling in order to seize the property. Having exercised her right of eviction to terminate the tenancy, she necessarily came into possession as bailee of the Culbertsons' property. The Culbertsons now demand that she restore their goods to them despite her doubt that she will receive the rent owed her.

The Fifth Circuit found in *Hall* that Texas law authorized the landlady to serve a governmental function in two respects: entry into the tenant's residence and seizure of his property. 430 F.2d at 439. Both are delegations by the state of the power—a power over which the state possesses a natural monopoly—to interfere coercively with possessory interests in property. *See* Yudof, *Reflections on Private Repossession, Public Policy and the Constitution*, 122 U.Pa.L. Rev. 954, 972 (1974). I agree with my

---

5. The aspect of Judge Weigel's scholarly opinion with which I cannot agree is that wherein reliance is placed upon a distinction between rights conferred by the common law and those created by later statutory enactment. I think it preferable to follow the approach taken in *Hall* and suggested in *Metropolitan Edison*, an approach which focuses upon the power or function being exercised in its relationship to the state, rather than to perpetuate common law distinctions which may have become obsolete. To this extent alone I agree with the First Circuit's comments in *Davis v. Richmond*, 512 F.2d 201, 203–04 (1st Cir. 1975).

But *cf. Adams v. Southern Cal. First Nat'l Bank, supra* n. 2. A distinction drawn upon the basis of common law rights vis-a-vis statutory rights creates unfortunate anomalies. This is dramatically illustrated by the fact that, under Judge Weigel's analysis, the actions of Alice Leland, who operated a small, low rent boarding house, were those of the state while the same actions of the operator of a large, modern hotel, who caters to transient guests, provides food and entertainment, and therefore qualifies as an "innkeeper," are not. I cannot conscientiously accept such a disparity.

Brother Ely regarding the dangers attendant on parceling this power out to individual creditors. Nevertheless, we clearly held in *Adams* that the state could delegate the power to repossess an automobile pursuant to U.C.C. § 9–503 without becoming "significantly involved" in the creditor's activities. The dangers inherent in such delegations include the potential for violence and the invasion of the individual's reasonable expectations of privacy. *Id.* at 978–80. Seizure of an automobile, or of other property which can be repossessed without the need of invading the debtor's residence, arouses less concern on both points than does a repossession which requires entering a home. Furthermore, section 9–503 explicitly restricts the right of repossession to those instances when it can be accomplished without a breach of the peace.

I would interpret *Adams* as holding without qualification that a creditor authorized by state law to seize property of his debtor, where this can be done without a breach of the peace, does not perform a public function so as to constitute state action. Two possible limitations have been suggested, neither of which I can accept.

Judge Weigel believes that *Adams* should be limited to repossessions authorized by a security agreement contracted between the parties. I do not believe that the existence of such an agreement is material. The debtor's defense might be a denial of the existence and validity of such an agreement. Until a hearing has been held, the claims that the debtor has granted a security interest to the creditor and has consented to repossession in case of default, as well as that he has defaulted, are no more than allegations by the creditor. Until the debtor's consent to repossession has been judicially established, all attempts to reclaim goods by self-help run the same risks of violence and invasion of privacy, regardless of the purported existence of a security agreement. If state action is not present in one case, it should not be found in the other.

Another possible limitation proposed by Judge Weigel is suggested by language in *Adams* itself. I strongly question *Adams'* dictum that *Hall* might be distinguished because in *Hall* the creditor had seized property which "belonged to the tenant" rather than property "that had been entirely his and that, practically and according to the terms of the contract, the debtor had not yet paid for." 492 F.2d at 336. *Fuentes v. Shevin,* 407 U.S. 67, 86–87, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), emphasizes that the critical property interest at stake in the context of prejudgment seizure is the right of the possessor to continued possession pending litigation of the claimant's claim. Until a hearing has been held, the creditor's ownership of the property is entirely speculative and unresolved, and the only undisputed issue is the debtor's present possession of the property.

If we are to hold that *Adams'* application depends on the "relationship of property to debt," the creditor finds his power to repossess before a hearing depending paradoxically on a fact that will not be established until a hearing is held. Even with the caveat that the creditor may not repossess if a breach of the peace is threatened, the possibility of violence is obviously increased when the debtor's right to resist repossession before a hearing turns on a necessarily undetermined fact. Furthermore, the appeal to history—asserting that a creditor's power to repossess an item sold under contract was recognized at common law while his right to seize property unrelated to the debt is a statutory invention—seems immaterial to determining the existence of state action.[1] I concur

---

1. [W]e are disinclined to decide the issue of state involvement on the basis of whether a particular class of creditor did or did not enjoy the same freedom to act in Elizabethan or Georgian England.

*Davis v. Richmond,* 512 F.2d 201, 203 (1st Cir. 1975).

in Judge Ely's rejection of this spurious distinction in footnote 5 of his concurring opinion.

As I would interpret *Adams,* I could concur in *Hall* only because of the grave threat to privacy interests occasioned by permitting a creditor to intrude upon the residential privacy of the debtor in quest of collateral. *Cf. Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Breard v. Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Mrs. Leland, on the other hand, entered the Culbertsons' apartment only after their tenancy had been terminated lawfully, and their right to expect and demand privacy had ended.[2] The state permitted Leland the exercise of no "public function" in authorizing her to retain a bailment as security for a debt. The First Circuit has held analogously that a bank may set off deposits against debts unrelated to the deposits. *Fletcher v. Rhode Island Hospital Trust National Bank,* 496 F.2d 927 (1st Cir.), *cert. denied,* 419 U.S. 1001, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974). The Seventh Circuit has held that retention of an automobile pursuant to a mechanic's lien is not the exercise of a public function so as to be state action. *Phillips v. Money,* 503 F.2d 990 (7th Cir. 1974), *cert. denied,* 420 U.S. 934, 95 S.Ct. 1141, 43 L.Ed.2d 409 (1975). I agree with the court's common-sense statement in *Fletcher:*

> [W]hatever the truth of the old saw that possession is nine-tenths of the law, a creditor who holds something of value to his debtor is differently situated from one who does not: he does not need the state to facilitate his collection efforts.

496 F.2d at 930. *See Davis v. Richmond,* 512 F.2d 201 (1st Cir. 1975).

The great central theme of *Fuentes* is that the state should not disrupt the possessory status quo until a hearing has been held to resolve the merits of the conflicting claims. The state has not obstructed this objective by allowing Mrs. Leland to retain her control over property to which the legal rights are in dispute. More broadly, in the absence of an invasion of the privacy interests of the home, I believe that *Adams* forecloses any claim that the state has deprived the debtors of due process by allowing self-help repossession pursuant to an asserted consensual or statutory lien.

I would affirm the dismissal by the district court.

---

**2.** In *Davis v. Richmond,* 512 F.2d 201 (1st Cir. 1975), the court found no state action even when the tenancy was not, apparently, terminated. The landlord did not enter the tenant's room to seize his personal effects, but prevented him from removing them from the premises. Where the landlord has an effective control over the entry to the rented premises, this procedure would protect his lien in the tenant's goods without necessitating an invasion of the tenant's dwelling.